**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| **GREEN MOUNTAIN** | ) | Case No. 14-64287-BEM |
| **MANAGEMENT, LLC,** *et al.*, [1] | ) | (Joint Administration Pending) |
| | ) | |
| Debtors. | ) | |
| | ) | |

**DECLARATION OF DANIEL B. COWART**
**IN SUPPORT OF EMERGENCY MOTIONS**

I, Daniel B. Cowart, declare and state as follows:

## I.   GENERAL BACKGROUND

1.      I am the Sole Member of Georgia Flattop Partners, LLC ("**Georgia**

**Flattop**"), which in turn is the Managing Member of Green Mountain Management, LLC

("**Green Mountain**," and, together with Georgia Flattop, the "**Debtors**").  I am also the

Chairman of Green Mountain.  I have held these positions since the inception of the

Debtors' business.  I am familiar with the day-to-day operations, business and financial

affairs of Debtors.

2.      I submit this Declaration in support of Debtors' petitions for relief under

chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**"), and Debtors'

---

[1]      The last four digits of the employer identification number for each of the Debtors follow in
parenthesis: (i) Green Mountain Management, LLC (0734) and (ii) Georgia Flattop Partners, LLC (3208).
The Debtors' mailing address is 3740 Davinci Court, Suite 460, Norcross, Georgia 30092.

Emergency Motions (as defined below).[2]  I am authorized to submit this Declaration on behalf of Debtors.

3.    Upon commencement of these chapter 11 cases (the "**Bankruptcy Cases**") Debtors will continue to operate as debtors in possession pursuant to 11 U.S.C. §§ 1107(a) and 1108.

4.    I submit this Declaration to enable the Court and other parties in interest to understand the circumstances that compelled the commencement of these Bankruptcy Cases and in support of the Emergency Motions.

5.    Except as otherwise indicated, all statements in this Declaration are based on my personal knowledge, review of relevant documents or opinion based upon my experience and knowledge of Debtors' business operations and financial condition.  If I were called upon to testify, I could and would testify to each of the facts set forth herein.

## II.    OVERVIEW OF THE DEBTORS' BUSINESSES

**History of Debtors' Businesses and the Landfill**

6.    Georgia Flattop is a limited liability company organized under Georgia law with its principal place of business in Norcross, Georgia.

7.    Green Mountain is a limited liability company organized under Delaware law with its principle place of business in Jefferson County, Alabama.

---

[2]    Capitalized terms not defined in this Declaration shall have the meaning ascribed to them in the Emergency Motions.

8.      Green Mountain is a 125 million cubic yard, subtitle D, municipal solid waste landfill in Adamsville, Alabama (the "**Landfill**").  Green Mountain's ability to accept waste at the Landfill is subject to the permit obtained from the Alabama Department of Environmental Management ("**ADEM**") (issued on August 6, 2007, as amended from time to time).  Pursuant to the amended permit, the Landfill is permitted to accept for disposal Municipal Solid Waste ("**MSW**"),[3] Industrial Solid Waste,[4] Special Waste,[5] and Construction and Demolition Debris ("**C&D Waste**" and collectively, the "**Acceptable Waste**").[6]

---

[3]      By ADEM definition, an MSW landfill is a discrete area of land or an excavation that receives household waste, and that is not a land application unit, surface impoundment, injection well, or waste pile, as those terms are also defined by ADEM.  An MSW landfill also may receive other types of solid wastes, such as commercial solid waste, nonhazardous sludge, conditionally exempt small quantity generator waste, industrial solid waste, construction/demolition waste and/or rubbish.  According to ADEM regulations, an MSW landfill may be publicly or privately owned.  An MSW landfill is commonly referred to as a "sanitary landfill" or a "Subtitle D landfill."

[4]      Industrial solid waste generally consists of solid waste generated by manufacturing or industrial processes that is not a hazardous waste regulated under Subtitle C of the Resource Conservation and Recovery Act.  Industrial solid waste may include, but is not limited to, waste resulting from the following manufacturing processes: electric power generation; fertilizer/agricultural chemicals; food and related products/by-products; inorganic chemicals; iron and steel manufacturing; leather and leather products; nonferrous metals manufacturing/foundries; organic chemicals; plastics and resins manufacturing; pulp and paper industry; rubber and miscellaneous plastic products; stone, glass, clay, and concrete products; textile manufacturing; transportation equipment; and wastewater treatment.  ADEM's definition of industrial waste also includes foundry waste, which includes slag, sand, baghouse dust and other materials arising from the significant iron and steel manufacturing operations in the area of the Project.

[5]      Special waste generally consists of, but is not limited to, those wastes requiring specific processing, handling or disposal techniques as determined necessary by ADEM which are different from the techniques normally utilized for handling or disposal.  Examples of such waste types may include, but are not limited to: asbestos waste; mining waste; fly ash; bottom ash; sludges; friable asbestos; industrial waste; large dead animals and residue, non-infectious medical waste, foundry waste, petroleum contaminated wastes, municipal solid waste ash, or contaminated soil from the cleanup of a spill.

[6]      Commercial and Demolition Debris waste generally consists of waste building materials,

3

9.      The initial pursuit (by third parties) of a permit for waste disposal on the Landfill began around 2002.  While the third parties pursued the waste disposal permit, Green Mountain's principals obtained an option to acquire the Landfill.  After obtaining the option, Green Mountain's principals assisted with the permit process.  In 2007, after the permit was acquired, Green Mountain Management, LLC was formed, with Georgia Flattop Partners, LLC as its Managing Member, for the purpose of developing and operating the Landfill.

10.     As a result of a dispute between Green Mountain and the original permit holder, an involuntary bankruptcy petition was filed against the Debtors on July 15, 2009 (Bankr. N.D. Ala. Case No. 09-00139).  No order for relief was entered and the case was dismissed on September 21, 2009.

11.     Following the dismissal of the involuntary bankruptcy case, the Debtors obtained ownership of the property on which the Landfill is located, which was not yet operational.  In order to equip and further develop the Landfill, the Debtors obtained funding from various sources, described in paragraphs 19-32 below.

12.     The Landfill opened and began accepting waste in December 2009.  Now, through amendments and expansions of the ADEM Permit, the Landfill can accept up to

---

packaging, and rubble resulting from construction, remodeling, repair, or demolition operations on houses, commercial buildings, and other structures.  Such wastes include, but are not limited to, masonry materials, sheet rock, roofing waste, insulation, scrap metal, concrete and wood products. In addition to the foregoing, the Permit allows for the disposal of appliances, tires, trees and other inert vegetative waste.

25,000 tons per day of solid waste for a permitted service area comprising the contiguous 48 states of the United States of America.

13.     The Debtor generally enters into waste disposal agreements with all of its customers.  Each such agreement establishes, among other things, the amount of the disposal fee for the various types of waste material a customer may bring to the Project Site.  Throughout its existence, the Debtor has actively sought and obtained disposal contracts with municipalities, industrial concerns and private waste haulers.

14.     Based upon permitted air-space, it is the largest MSW landfill in the southeastern United States.  Located northwest of Birmingham on a 1,500 acre property on the site of a former coal strip mine formerly known as the Flattop Mine, Green Mountain provides disposal services for private waste haulers, municipalities, and industrial customers.  It engages in the disposal of Municipal Solid Waste, C&D Waste, Industrial Solid Waste, Special Waste, and liquid waste, as well as recycling of concrete. Green Mountain's location provides it with structural, strategic, geographic, and transportation advantages.

15.     The MSW business is composed of two parts, transportation hauling and disposal.  Transportation access is extremely important in the waste disposal business and Green Mountain has a direct geographic advantage to Birmingham customers by its physical location and short hauling benefits.

5

**Hauling Services**

16.    In competitive markets such as Birmingham, it is necessary for most landfills to provide hauling services to ensure vertical integration for customer satisfaction.  So that the Debtors could offer hauling services necessary to the success of their businesses, Jeffrey Claunch, the former manager of Green Mountain, and I created Vulcan Disposal, LLC.[7]  Disputes arose between the Debtors and Mr. Claunch as a result of Mr. Claunch's alleged diversion of revenue away from Green Mountain and into Vulcan Disposal and other entities competing with Green Mountain in which Mr. Claunch held interests.  Prior to the Petition Date, the Debtors and other interested parties reached a settlement with Mr. Claunch that will transfer full ownership of Vulcan Disposal to entities managed and/or owned by Green Mountain.  Vulcan Disposal represented half of Green Mountain's overall revenues in 2012 and rebuilding the hauling component of the Debtors' business is its top priority.

17.    The Landfill is 10 miles from the Birmingham city limits, located just off of I-22, which will connect Memphis, Tennessee directly with Birmingham when it opens in late 2014.  Two railroads are located on the Landfill's neighboring property, along with a former barge port site that can be reconstructed for future barging of bulk material.  Rail and water transportation are by far the preferred modes of low cost transportation in a

---

[7]    Equal shares of Vulcan Disposal, LLC were held by DBC Vulcan, LLC (47.5% - controlled by Mr. Cowart) and Blue Water Holdings (47.5% - controlled by Mr. Claunch), with the remaining shares being controlled by Thomas Chapman, then an accountant for Green Mountain.

bulk commodity transportation business and the development of these modes of transport into the Landfill is an opportunity for growth of the Debtors.

**Coal Ash Disposal**

18.    Coal ash is currently the subject of reclassification by the Environmental Protection Agency (EPA) under the Resource Conservation and Recovery Act regulations (RCRA) and is expected to be subject to a subtitle D disposal requirement by the end of the year.  This will mark perhaps the largest change in waste disposal requirements since the RCRA was enacted in 1976, as there is as much coal ash created in the United States every year as there is garbage.  Additionally, most coal-fire steam plants are located on navigable water and/or rail and the Debtors anticipate utilizing their uniquely sized and situated Landfill to take advantage of this opportunity.

**Debtors' Debt Structure**

19.    As detailed above, the Landfill was not operational when Green Mountain acquired ownership of the property.  In order to fund the development and equipping of the Landfill, the Debtors sought funding and ultimately entered into a financing transaction pursuant to which the SWDA (i) issued $17,000,000.00 in bonds and (ii) used the proceeds of the bonds to (a) purchase the Landfill in a sale/leaseback transaction and (b) provide sufficient capital to finish the construction of certain improvements at the Landfill and acquire certain equipment necessary to commence operations.  In furtherance of the financing transaction, the SWDA entered into a 20 year lease

agreement with Green Mountain concerning the operation of the Landfill.  Under the lease, the "rental" payments owing from the Debtors are structured to fund the amounts necessary to satisfy principal and interest on the bonds when such payments become due. The SWDA has assigned its rights in the lease (including "rent") to the bondholder, removing the SWDA from the relationship for most practical purposes and leaving the bondholder (and its indenture trustee) the Debtors' secured lender.  These transactions are described in more detail below.

20.    **Solid Waste Disposal Revenue Bonds, Series 2010**.  Debtor Green Mountain Management, LLC is party to a Mortgage and Trust Indenture (the "**Trust Indenture**") dated August 1, 2010, with SWDA (also known as the "**Issuer**"), as "Issuer," and UMB Bank, N.A. ("**Indenture Trustee**" or "**UMB**")[8] as "Trustee" (as those terms are used in the Trust Indenture).  Pursuant to the Trust Indenture, the Issuer issued its $17,000,000 Solid Waste Disposal Revenue Bonds, Series 2010 (the "**Bonds**") to finance the acquisition, construction and equipping of the Landfill.

21.    In connection with the Trust Indenture, on August 1, 2010, SWDA leased the Landfill to Green Mountain pursuant to a Lease Agreement (the "**Lease Agreement**"), which provides for rental payments at times and in amounts equal to the amounts owing on the Bonds.  SWDA's interests in the Lease Agreement, including payments due thereunder, were contemporaneously pledged and assigned to the Indenture Trustee as security for the Bonds.

---

[8]    UMB is the successor trustee to The Bank of New York Mellon Trust Company, N.A.

22.     Also on August 1, 2010, Green Mountain entered into a Bond Guaranty Agreement (the "**Bond Guaranty**"), guarantying the payment of the amounts owing on the Bonds.

23.     The Bonds were offered for sale pursuant to a Bond Purchase Agreement between SWDA, Green Mountain and First Tuskegee Bank, as underwriter, dated August 25, 2010 (the "**Bond Purchase Agreement**" and, together with the Trust Indenture, Lease Agreement, Bond Guaranty and other documents delivered as security for or in connection with the Bonds, the "**Bond Documents**"), and subsequently purchased by the Nuveen High Yield Municipal Bond Fund and Nuveen Municipal High Income Opportunity Fund (together with their investment advisor Nuveen Asset Management, LLC, "**Nuveen**" or the "**Bondholder**").

24.     **Debt Service**.   Pursuant to the Bond Documents, Green Mountain is required to make annual principal payments[9] and semi-annual interest payments as rent under the Lease Agreement, which payments are to be applied to the principal and interest due under the Bonds.   Pursuant to the payment schedule, the principal and interest due under the Bonds would be fully satisfied as of their August 1, 2030 maturity date.

25.     To satisfy its payment obligations to the Indenture Trustee, Green Mountain maintains a segregated business checking account into which all customer payments and deposits are made (the "**Customer Deposit Account**").   Each Wednesday,

---

[9]      The first five (5) payments were scheduled to apply and were applied to interest only.

Green Mountain transfers the full balance of the Customer Deposit Account to the Indenture Trustee.  On a monthly basis, Green Mountain provides an operating budget to the Indenture Trustee and, upon approval of the budget by the Indenture Trustee, funds equal to the monthly budgeted operating expenses are wire transferred back to Green Mountain.  Any excess funds received from the Customer Deposit Account not required to fund the monthly operating expenses are retained by the Indenture Trustee and maintained in a debt reserve account to fund the semi-annual payments due under the Bonds.

26.    Green Mountain made its first five (5) payments due under the Bond Documents, totaling $3,615,451.39, which were applied to interest.  Principal and interest payments totaling $1,889,125 were due on August 1, 2013 ($420,000 principal and $743,750 interest) and February 1, 2014 ($725,375).  Green Mountain was unable to make those payments.

27.    Green Mountain and the Indenture Trustee entered into a Forbearance Agreement dated February 7, 2014 (the "**Forbearance Agreement**"), pursuant to which the Indenture Trustee agreed to, among other things and subject to certain limitations and requirements, forbear from exercising remedies under the Bond Documents through May 22, 2014.

28.    Green Mountain's next principal and interest payment totaling $1,185,375 ($460,000 principal and $725,375 interest) is due on August 1, 2014.  The Forbearance

Agreement further requires the repayment of all overdue amounts on the Bonds no later than August 1, 2014.

29.    As of the Petition Date, the outstanding principal balance due under the Bonds remained $17,000,000.

30.    **Prepetition Security Agreements**.   In connection with the Lease Agreement, Green Mountain pledged to SWDA a first lien on and security interest in (the "**Prepetition Liens**"), among other things, substantially all of Green Mountain's personal property including receipts, revenues, income and receivables, all as more particularly described in the Bond Documents (collectively, the "**Prepetition Collateral**").   SWDA in turn pledged its interests in the Prepetition Collateral, and all other interests in the Lease Agreement, to the Indenture Trustee as security for the Bonds.

31.    **Other Financing**.   In addition to the Bonds, Georgia Flattop is party to a Loan Agreement with Tenth Street Fund II, LP ("**Tenth Street**") dated January 4, 2012, pursuant to which Georgia Flattop borrowed $1,125,000 from Tenth Street (the "**Tenth Street Loan**").   The Tenth Street loan is secured by, among other things, Georgia Flattop's interests in Green Mountain.  The proceeds of the Tenth Street Loan were used as a capital infusion into Green Mountain.

32.    A payment on the Tenth Street Loan in the amount of $22,576.18 (including a $10,000 "extension fee") becomes due on August 1, 2014.  As of the Petition Date, the balance due under the Tenth Street Loan is $1,225,861.96.

**Events Leading to Debtors' Chapter 11 Filings**.

33.    While the Debtors' current revenues are sufficient to support operations, and are expected to increase further due to increasing demand, the Debtors have been unable to service the debt owing under the Bonds, missing the past two semi-annual payments.  A payment in the amount of $725,375 becomes due on August 1, 2014, and the Debtors do not have sufficient funds to satisfy this obligation.  The Debtors were unable to reach an agreement with the Indenture Trustee and the Bondholder to further extend the Forbearance Agreement and, absent the automatic stay, the Debtors risked termination of the Lease as a result.

34.    Additionally, as set forth above, prior to the Petition Date, Debtors were involved in litigation with their former management, which impacted the Debtors' hauling business and overall revenues.  While this matter has recently been settled, the costs of litigation and the diversion of key management strained the Debtors' resources. The "breathing room" provided by the filing of the Bankruptcy Cases is necessary to put effective operation strategies into place and reorganize the Debtors' business.

**III.    SUPPORT OF EMERGENCY MOTIONS**

35.    In connection with the Bankruptcy Cases, Debtors have filed the following motions and applications (collectively, the "**Emergency Motions**"):

   a.    ***Debtors' Emergency Motion for Order Directing Joint Administration of Related Chapter 11 Cases (the "Joint Administration Motion")***

12

       b.     ***Debtors' Emergency Motion for an Order Pursuant to 11 U.S.C. §§ 102 and 105(a) and Bankruptcy Rules 2002(m) and 9007 Establishing Certain Notice Procedures (the "Notice Procedures Motion");***

       c.     ***Debtors' Emergency Motion for Interim and Final Orders Authorizing Use of Cash Collateral and Authorizing and Approving Grant of Adequate Protection (the "Cash Collateral Motion");[10]***

       d.     ***Debtors' Emergency Motion for an Order (I) Authorizing (A) Payment of Prepetition Employee Wages and Benefits and (B) Continuation of Prepetition Benefits and Insurance Programs and (II) Authorizing and Directing Bankruptcy to Honor Related Payments (the "Employee Wage Motion");***

       e.     ***Debtors' Emergency Motion to Reject Contract with Michael J. Selwood (the "Selwood Rejection Motion"); and***

       f.     ***Debtors' Emergency Motion for Order (I) Scheduling a Hearing on Emergency Motions on an Expedited Basis and (II) Modifying Applicable Notice Requirements (the "Emergency Hearing Motion").***

36.    As a result of my first-hand experience, review of various materials and information, discussions with Debtors' executives, and discussions with Debtors' advisors, I have formed opinions as to (a) the necessity of obtaining the relief sought by Debtors in the Emergency Motions, (b) the need for Debtors to continue to operate effectively, and (c) the likely consequences facing Debtors if the requested relief is not granted.

37.    I have reviewed each of the Emergency Motions (including the exhibits and schedules attached thereto) and, to the best of my knowledge, believe the facts set forth

---

[10]    The Debtors are in the process of finalizing a consensual Cash Collateral Motion, Cash Collateral Budget and Interim Order with the Indenture Trustee and anticipate filing those documents on July 29, 2014.

therein are true and correct.  In connection with the Emergency Motions, I declare as follows:

**JOINT ADMINISTRATION MOTION**

38.     Through the Joint Administration Motion, Debtors seek to jointly administer their chapter 11 cases solely on an administrative basis.  Based on the consolidated nature of Debtors' business, I believe that joint administration of the Bankruptcy Cases is warranted.  Joint administration will avoid the preparation, filing and service of duplicative notices, applications, and orders, thereby saving Debtors and their estates considerable time and expense.  Because Debtors run a consolidated business, creditors and other parties in interest will not be confused by joint administration and rather would likely be more confused and burdened by separate procedures and hearings.

39.     The rights of creditors will not be adversely affected as that Motion requests only administrative consolidation of these cases, and not substantive consolidation of the estates.  The rights of all creditors will be enhanced by the reduced costs that will result from joint administration of these Bankruptcy Cases.

**NOTICE PROCEDURES MOTION**

40.     Through the Notice Procedures Motion, Debtors seek to establish certain notice, case management and administrative procedures, all subject to further order of the Court, including: (a) limiting the notice procedures in these Bankruptcy Cases;

14

(b) designating the parties upon whom notice must be served and how such service must be made; and (c) allowing electronic service of documents.

41.    I believe that by regulating the service, notice and filing requirements at the outset of the Bankruptcy Cases, the Court will minimize confusion regarding important procedural matters.  Further, I believe these proposed procedures will ease the Court's administration of the Bankruptcy Cases and reduce the economic burdens on Debtors' estates.

**CASH COLLATERAL MOTION**

42.    It is the position of the Indenture Trustee and the Bondholder Green Mountain's cash, including but not limited to its bank account balances, future receipts, revenues, income and receivables are subject to the Prepetition Liens and constitute cash collateral (the "**Cash Collateral**") within the meaning of 11 U.S.C. § 363(a).

43.    Through the Cash Collateral Motion, Debtors seek the entry of an Interim Order (i) authorizing Debtors to use Cash Collateral and (ii) authorizing and approving the grant of adequate protection to the Indenture Trustee on account of such use.  Further, Debtors seek entry of a Final Order, after at least fourteen (14) days' notice of the Motion.

44.    I believe that without the ability to use the Cash Collateral, Debtors will have little choice but to terminate or suspend all operations and dismiss employees, thus destroying the value of their business.

15

45.      Debtors seek Court authority to use Cash Collateral under the terms and conditions of the Cash Collateral Motion and the Cash Collateral Budget proposed Interim Order attached thereto.  As noted above, the Debtors are in the process of finalizing a consensual Cash Collateral Motion, Cash Collateral Budget and Interim Order with the Indenture Trustee and anticipate having the Indentured Trustee and Bondholder's full support for the Debtors' use of Cash Collateral as of the filing of the Motion.  Subject to final agreement with the Indenture Trustee and the terms of the Interim Order, the principal elements of the relief sought by the Debtors are summarized as follows:

(a)      **Use of Cash Collateral**.  Debtors will be permitted to use Cash Collateral in their discretion for the purpose of meeting Debtors' cash needs subject to the Cash Collateral Budget.  For any week, the use of Cash Collateral may vary from the line items in the Cash Collateral Budget so long as the actual expenditures paid by Debtors do not exceed 110% of the projected expenditures in the Cash Collateral Budget and provided that Debtors' weekly minimum cash balance is not less than 90% of the amount projected in the Cash Collateral Budget for the week shown.

(b)      **Adequate Protection**.  Debtors propose to provide the following adequate protection to the Indenture Trustee in exchange for use of Cash Collateral:

16

(i)  *Adequate Protection Liens*.  The Indenture Trustee, for the benefit of the Bondholder, will receive, pursuant to 11 U.S.C. §§ 361(2) and 363(e), a valid, perfected and enforceable security interest (the "**Adequate Protection Liens**") equivalent to a lien granted pursuant to 11 U.S.C. §§ 364(c) and (d) to the extent of any diminution in value of the Indenture Trustee's interest in the Debtors' assets from and after the Petition Date.  The Adequate Protection Liens do not extend to chapter 5 causes of action or other assets that would not have constituted Prepetition Collateral.  Furthermore, the Adequate Protection Liens will not have priority over any Prior Liens of other purportedly secured lenders or the Carve-Out.

(ii) *Adequate Protection Superpriority Claim*.  The Indenture Trustee will be granted an allowed administrative expense claim pursuant to 11 U.S.C. §§ 503(b), 507(a)(1) and 507(b) to the extent of any diminution in the value of the Prepetition Collateral, and such claim shall have priority over, and be senior to, all other administrative claims (other than the Carve-Out) as set forth in the proposed Interim Order.

(iii) *Adequate Protection.*  The Landfill is valued in excess of the amounts owing under the Bonds, providing a substantial equity cushion to protect the interests of the Indenture Trustee and the Bondholder.

> *(iv) Payment of the Indenture Trustee's Professional Fees.* Debtors shall pay to the Indenture Trustee the professional fees and expenses incurred by the Indenture Trustee (whether incurred before or after the Petition Date), subject to a ten (10) day objection period by Debtors, the U.S. Trustee or the Committee (if appointed) after delivery of a professional's invoice.

46.     The proposed use of Cash Collateral under the terms of the proposed Interim Order is being negotiated in good faith and at arm's-length, with all parties represented by counsel, and is fair and reasonable under the circumstances. Absent the ability to use cash collateral, Debtors cannot operate their business and would be forced to liquidate. Cash Collateral is Debtors' only realistic source of operating funds and, without access to cash collateral, Debtors will be forced to cease operations and convert these Bankruptcy Cases to cases under chapter 7, which I believe would result in a loss of significant value.

**EMPLOYEE WAGE MOTION**

47.     Through the Employee Wage Motion, Debtors seek permission to pay certain prepetition obligations owed to employees and to continue to honor employee obligations and programs in the ordinary course of business. I believe it is essential that Debtors maintain employee morale, particularly as Debtors transition into being chapter 11 debtors-in-possession. Maintaining employee benefits and honoring prepetition wage

obligations is critical to that effort.  If Debtors cannot provide assurance that all of the outstanding and future wage and benefits will be honored, employee concerns may lead to rapid attrition.

48.   A loss employee confidence may lead to significant costs for Debtors and their estates, including (i) out-of-pocket and intangible costs to recruit and train new employees, (ii) Debtors' inability to close the proposed sale of their assets, and (iii) further strain on Debtors' relationships with customers and vendors.

## A. Employee Obligations

49.   Debtors currently have 22 full-time employees and two part-time employees.[11]  As of the Petition Date, Debtors had a number of accrued obligations with respect to employee compensation and benefits, described more fully below.

### i.   Wages and Salaries

50.   Debtors estimate that they owe employees approximately $28,000.00 in accrued unpaid wages and salaries as well as a monthly stipend of $350.00 per full-time employee of the Petition Date.  The $350.00 monthly stipend is provided to each full-time employee in order to fund a portion of their health insurance.  The Debtors' general manager is paid an additional stipend of $591.00.  For the reasons expressed herein,

---

[11]    The employees that are the subject of the Employee Wage Motion are employees of Green Mountain.  Georgia Flattop is a sole member limited liability company and does not have employees.  In addition to myself, two individuals providing "back office" services to the Debtors are employed by Dan Cowart, Inc. ("**DCI**"), a non-debtor affiliate of the Debtors.  The Debtors, in turn, fund a portion of the salaries for these DCI employees.  No benefits or wages owing to DCI employees are subject to the Employee Wage Motion and the forward looking reimbursement of such expenses is addressed in the Debtors' Cash Collateral Budget.

Case 14-64287-bem    Doc 12    Filed 07/28/14    Entered 07/28/14 17:08:36    Desc Main
Document       Page 20 of 28

Debtors seek authority (directly or through their payroll vendor) to pay these accrued amounts.

51.    Debtors pay their employees weekly through Paychex, an outside payroll vendor.  Immediately prior to a scheduled payroll date, payroll funds are transferred from Debtors' operating account (the "**General Operating Account**") to Paychex.  On the same day that Paychex receives the payroll funds by automated clearing house from the General Operating Account, Paychex either pays an employee by direct deposit (for the 18 employees that have set up direct deposit arrangements) or pays the employee by issuing a check drawn on Paychex's bank accounts (for the 6 employees that receive checks).

52.    All employees were last paid prior to the filing of the petitions on July 25, 2014, for the payroll period ending on July 19, 2014.  The next scheduled payroll date for regular employees is August 1, 2014.

ii.    *Withholdings and Deductions*

53.    Included in the accrued but unpaid prepetition payroll amounts described above are funds withheld by Debtors, or Paychex, on behalf of Debtors, for the benefit of third parties, including amounts relating to employee taxes, insurance premiums,[12] 401(k) contributions, child support and other garnishments, as applicable, and other withholdings as required by federal, state, and local laws.  Debtors seek authority,

---

[12]    Debtors do not provide medical, dental, disability and life insurance benefit plans to their employees.

20

directly or through Paychex, to release withholdings, described below, that were not processed as of the Petition Date, if any, to the appropriate recipient and to deduct and release withholdings for any accrued prepetition wages and salaries authorized for payment pursuant to this Motion.

54.    Paychex directly deducts and remits certain withholdings from employee paychecks to third parties, primarily withholdings that are common to many companies such as federal tax, state tax, and social security withholdings.[13]  Debtors or Paychex transfer withheld funds to the appropriate recipient as soon thereafter as is practicable.

55.    **Medical Benefits and Supplemental Life Insurance** – Although Debtors do not provide medical or disability benefits to their employees, certain employees have obtained their own insurance or disability coverage, including supplemental insurance and disability coverage.  Employees do have premiums for certain Aflac supplemental medical, life, and disability coverage deducted from their paychecks and paid to Aflac. Additionally, Debtors offer optional life insurance for employees and dependents.  On average, Paychex, on behalf of Debtors, withdraws $161.00 weekly from the paychecks of employees who have elected optional life insurance or have supplemental medical, life, and disability coverage.

56.    **Garnishments** – As required by various garnishment orders served on them, Debtors may from time to time garnish specific amounts from certain employees' wages

---

[13]      Unemployment taxes owed by Debtors are paid by Debtors and not deducted from payroll. Debtors transfer amounts owed for unemployment to Paychex and Paychex remits these amounts to the applicable agencies on behalf of Debtors.

earned during each payroll cycle and transfer them to the creditor of the employee. Ordinarily, Paychex—on behalf of Debtors—transfers such garnished wages to third parties.

57.    **401(k) Plan** – Debtors sponsor a tax-qualified, defined-contribution retirement savings plan pursuant to Section 401(k) of the Internal Revenue Code (the "**401(k) Plan**"). The 401(k) Plan is managed by Paychex. Paychex calculates the amounts to be deducted from employees' paychecks for 401(k) Plan contributions and directly deducts those amounts from employees' paychecks. Paychex withdraws approximately $40.00 per week for the one employee who currently contributions to the 401(k) Plan.

*iii.    Reimbursements*

58.    Debtors seek authority, but not direction, to continue their expense reimbursement policies, described below, and to honor prepetition reimbursement requests that were not processed as of the Petition Date.

59.    **Expense Reimbursements** – Debtors reimburse certain employees for goods incurred or services procured by them in connection with Debtors' businesses, such as business travel expenses or out-of-pocket costs for supplies. These costs and expenses are ordinarily reimbursed within seven to ten days after reimbursement paperwork is received. There may be expenses incurred by employees prepetition that were not submitted or processed for reimbursement before the Petition Date.

22

*iv.*    *Employee Leave*

60.    Debtors seek authority, but not direction, to continue their leave policy and to honor any prepetition obligations owed to employee in connection with this policy.

61.    Debtors have a paid time off ("**PTO**") program (the "**Leave Policy**") that allows employees to take paid leave for vacation, illness, or other matters.  All employees are provided with three sick days of PTO each year.  In addition to the three sick days, employees that have been employed by Debtors for more than one year but less than three years are allotted five additional days of PTO per year.  Employees that have been employed by Debtors for more than three years are allowed ten additional days of PTO per year.  Employees are not allowed to roll-over accrued but unused PTO into the next calendar year.

**B.    Insurance Obligations**

62.    Although Debtors do not provide medical, dental or disability insurance benefits to their employees, certain employees have obtained their own insurance or disability coverage using the $350.00 monthly stipend Debtors provide for that purpose. Employees do have certain Aflac supplemental insurance and disability premiums deducted from their paychecks and paid to Aflac.  The monthly average of premiums withheld from all employee paychecks for submission to Aflac for supplemental insurance or disability is approximately $645.  The total amount withheld from employee

paychecks as of the Petition Date to be submitted to Aflac (or other third party insurers) is less than $1,000.00.

63.     Debtors' have Workers' Compensation Insurance Obligations and seek authority to continue the Workers' Compensation Insurance (defined below) and to pay, in their discretion, amounts due under this insurance in the ordinary course, regardless of when these obligations accrued.

64.     Applicable state law requires that Debtors maintain workers' compensation policies and programs to provide their employees with workers' compensation benefits for claims arising from or related to their employment with Debtors.  Debtors maintain their current workers' compensation coverage for the state of Alabama through third party insurance policies (the "**Workers' Compensation Insurance**") provided by Associated General Contractors of America.  The annual premium for the Associated General Contractors of America policy is $52,958.00.  The monthly average of payments made by Debtors toward the remaining balance of the annual premium is approximately $3,900.00.

65.     Debtors request authority to pay deductible and retention amounts that have accrued under the Workers' Compensation Insurance, including amounts accrued prepetition or processed but not paid as of the Petition Date.  I believe that if the relief requested in the Employee Motion is not granted, Debtors' operations may be disrupted by a loss of employees.  Employee losses, particularly shortly after Debtors enter chapter

11, will impose significant cost, including the costs of training new employees (and higher pay that may be required to attract new employees) and loss of business due to strained relationships with customers and vendors, with whom former employees were the primary point of contact.  Without their existing workforce Debtors' would face substantial risk of being unable to maintain operations and thus be unable to maximize value through sale of their business as a going concern instead of a piecemeal liquidation.

**MOTION TO REJECT SELWOOD CONTRACT**

66.     Through the Motion to Reject the Selwood Contract, Debtors seek to reject a services agreement with Michael J. Selwood.  In its prepetition negotiations with the Indenture Trustee in connection with the Forbearance Agreement, Debtor Green Mountain agreed to retain Michael J. Selwood to provide financial and operational services relating to its operations and entered into a services agreement with Mr. Selwood dated December 9, 2013 (the "**Contract**").

67.     The Contract provides, among other things, that (i) Debtor Green Mountain will be solely responsible for paying Mr. Selwood's fee of $20,000.00 per month and any reasonable and necessary expenses incurred by Mr. Selwood related to his duties; (ii) Mr. Selwood will be given unfettered access to the Debtor Green Mountain's books and records and its operations; and (iii) Mr. Selwood's duties will include refining financial reporting, developing and assisting with a turnaround and growth plan, providing

operational and financial support, making recommendations on retaining and hiring personnel, and recommending strategic alternatives.

68.     On the Petition Date, Mr. Selwood notified the Debtors of his resignation, indicating that he would continue to provide services under the Contract for fourteen (14) days.   On July 28, 2014, the Debtors notified Mr. Selwood that the Contract was terminated effective immediately pursuant to Section 3(b)(4) of the Contract.

69.     Mr. Selwood has not provided any services to or on behalf of the Debtors since at least July 25, 2014.   In light of the large expense of employing Mr. Selwood ($20,000.00 a month) and Mr. Selwood's requested resignation, Debtors have decided, in their reasonable business judgment, to reject the Contract.   The Contract is of no value to the Debtors' estates and the assumption of the same would only impose unnecessary administrative obligations on the estates.   Debtors have therefore determined that it is reasonable and in the best interest of their estates to reject the Contract in order to effectuate their reorganization.   Further, rejecting the Contract *nunc pro tunc* to the Rejection Date is essential to preserving the value of Debtors' estates by avoiding unnecessary and unbeneficial post-petition expenses that Mr. Selwood may assert.

**EMERGENCY HEARING MOTION**

70.     Through the Emergency Hearing Motion, Debtors seek to establish an emergency hearing on the Emergency Motions and establish notice procedures for these pleadings.  I believe that such relief is necessary as the requests for relief made in that Motion are necessary to (i) retain employees during a critical period; (ii) obtain funding for Debtors' bankruptcy cases and (iii) allow Debtors to continue and implement procedures that will enable them to operate efficiently during the Bankruptcy Cases. Further, I believe that the proposed notice provisions in the Emergency Hearing Motion will adequately put Debtors' parties in interest on notice of the various requests for relief.

[signature on following page]

IV.    **CONCLUSION**

71.    I hereby certify that the foregoing statements are true and correct to the best of my knowledge information and belief, and respectfully request that all of the relief requested in the Emergency Motions be granted, together with such other and further relief as is just.

Dated: July 28, 2014
      Atlanta, Georgia

                          _____
                          Daniel B. Cowart
                          Chairman, Green Mountain Management, LLC
                          Sole Member, Georgia Flattop Partners, LLC