## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| **GREEN MOUNTAIN** | ) | Case No. 14-64287-BEM |
| **MANAGEMENT, LLC,** *et al.*, | ) | (Jointly Administered) |
|  | ) |  |
| Debtors. | ) |  |
|  | ) |  |

## MOTION FOR THE APPOINTMENT OF A CHAPTER 11 TRUSTEE
## BY UMB BANK, NATIONAL ASSOCIATION, AS BOND TRUSTEE

UMB Bank, National Association, not in its individual capacity but as indenture trustee (the "**Bond Trustee**") for the Bonds (defined and described below), respectfully moves this Court (the "**Motion**") for an order directing the appointment of a chapter 11 trustee for Green Mountain Management ("**GMM**") and Georgia Flattop Partners, LLC ("**Flattop**" and together with GMM, the "**Debtors**") pursuant to sections 1104(a)(1) and 1104(a)(2) of the United States Bankruptcy Code (the "**Bankruptcy Code**"), 11 U.S.C. § 101 *et seq.*  In support of this Motion, the Bond Trustee states as follows:

### PRELIMINARY STATEMENT

1.     Immediate appointment of a chapter 11 trustee for the Debtors is necessary to protect the interests of the Debtors' stakeholders in these bankruptcy cases.  The significant nature of the relief the Bond Trustee seeks in this Motion is justified by the substantial and manifest conflicts of interest of the Debtors' controlling  insider – Daniel B. Cowart – his history of mismanagement and self-dealings, and the fraud he committed against GMM and its creditors, just one year prior to the filing of these bankruptcy cases.

2.       Daniel B. Cowart ("**Cowart**") exercises total control over the Debtors.  He is the

sole member and 100% owner of Flattop, which in turn is the managing member of GMM.

Flattop owns 93.15% of the equity interests of GMM.  Cowart is the Chairman of GMM.

Cowart has used his control over the Debtors for his personal benefit and to the detriment of

the Debtors and their creditors.  As described more fully below, even without the benefit of

any discovery having been conducted, the Bond Trustee is aware that Cowart has:

- Prior to the filing of the bankruptcy cases, transferred for no consideration certain of the Debtors' assets, the right to mine rock located on the Debtors' property (the "**Rock Rights**"), which rights the Debtors have represented may be more valuable than the Landfill itself, to a company fully-owned by Cowart and his children;

- Failed and refused, despite repeated requests from the Bond Trustee, to return the Rock Rights to GMM;

- Failed and refused, despite repeated requests from the Bond Trustee, to direct GMM to seek return of the Rock Rights;

- During the bankruptcy case, and presumably prior to the bankruptcy case, attempted to alienate the Rock Rights through joint ventures with other third parties, for the benefit of the Cowart-owned business, but with no resulting benefit to GMM;

- In furtherance of exploiting the Rock Rights for his benefit, used equipment owned by, and employees of, GMM for the benefit of such Cowart-owned business;

- Breached his fiduciary duties to creditors of the Debtors' estates by failing to negotiate in good faith with the Bond Trustee a plan for the Debtors to exit bankruptcy as expeditiously as possible in the face of business operations that cannot sustain themselves and the additional administrative costs of the bankruptcy; rather Cowart has pursued an entrenchment strategy designed to keep these cases in bankruptcy as long as possible so that he can solidify his power as owner and chairman of GMM and use it to attempt to exploit the Rock Rights, all to the detriment of GMM and its creditors;

- Used his theft of the Rock Rights as leverage to attempt to extort concessions from the Bond Trustee regarding the treatment of its claim

and other matters, which concessions are designed to enrich and benefit Cowart and his family, and not GMM or its creditors;

- Lost the confidence and support of the sole creditor constituency active in this case, namely the Bond Trustee, to the point where the Bond Trustee will not consent to the continued use of its cash collateral nor to a requested $2 million priming debtor-in-possession financing (which the Bond Trustee has been told is necessary, in part, to pay the fees and costs of the professionals in these bankruptcy cases) if Cowart is not replaced by a chapter 11 trustee, or otherwise steps aside voluntarily.

3.      Moreover, Cowart himself is entirely unnecessary to the operation of the Landfill business, as demonstrated by the fact that, for so long as he has owned the Landfill, he has employed third party consultants or operators to operate it, and has, in fact, requested that the Bond Trustee consent to the appointment of yet another landfill professional, in addition to the financial advisor the Debtors have already retained.

4.      As a result of Cowart's myriad conflicts of interest, his attempts to entrench himself in GMM and exploit the ill-gotten Rock Rights to the detriment of creditors and his inability to effectively manage the Debtors' business, the Debtors are languishing in bankruptcy. Cause therefor exists for the appointment of a chapter 11 trustee to allow the Debtors to move forward toward a resolution of these bankruptcy cases unfettered by a principal whose only interest is enriching himself and his children at the expense of creditors.

5.      Apart from the "cause" that exists for the appointment of a chapter 11 trustee, the best interests of the creditors and the estates of the Debtors warrant the appointment of a chapter 11 trustee to assume management and control of the business, seek recovery of the valuable Rock Rights, formulate an exit strategy designed to ensure that these Debtors emerge from bankruptcy as soon as practicable, and negotiate the continued use of cash collateral and a necessary priming debtor-in-possession financing so that the Debtors can survive the bankruptcy process long enough to permit the chapter 11 trustee to effectuate an exit plan.

## JURISDICTION AND VENUE

6.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and

1334.  This is a core proceeding within the meaning of 28 U.S.C. § 157.  Venue is proper in the

Northern District of Georgia pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory predicates

for the relief requested herein are 11 U.S.C. §§ 105(a) and 1104(a) of the Bankruptcy Code.

## FACTUAL BACKGROUND

### A.      General Background of the Debtors

7.      On July 25, 2014 (the "**Petition Date**"), each of the Debtors filed a voluntary

petition for relief under the Bankruptcy Code commencing their chapter 11 cases.

8.      On July 31, 2014, the Court entered an order approving the Debtors' application

seeking joint administration of these cases for procedural purposes.

9.      The Debtors have continued in possession of their properties and have continued

to operate and manage their businesses as debtors-in-possession pursuant to 11 U.S.C.

§§ 1107(a) and 1108.

10.      According to the Debtors, GMM is the largest municipal solid waste landfill in

the southeastern United States.  GMM is a 1500-acre site that provides disposal services for

private waste haulers, municipalities, and industrial customers.  It engages in the disposal of

municipal solid waste, construction and demolition debris, industrial solid waste, liquid

waste and special waste requiring additional handling techniques, as well as recycling of

concrete.

### B.      The Bond Debt

11.      Pursuant to a Mortgage and Trust Indenture, dated August 1, 2010, by and among

GMM, The Solid Waste Disposal Authority of the City of Adamsville (the "**Issuer**") and the

Bond Trustee, the Issuer issued its $17,000,000 Solid Waste Disposal Revenue Bonds, Series

2010 (the "**Bonds**") to finance the acquisition, construction and equipping of a solid waste

disposal facility, including the underlying real property (the real property, solid waste disposal

facility and improvements are collectively referred to as the "**Landfill**").  The Issuer leased the

Landfill to GMM pursuant to a Lease Agreement (the "**Lease Agreement**"), which provides for

rental payments at times and in amounts equal to the amounts owing on the Bonds.  The Issuer's

interests in the Lease Agreement have been pledged and assigned to the Bond Trustee as security

for the Bonds and GMM has guaranteed the payment of the amounts owing on the Bonds.

12.     As of the Petition Date, the principal and interest due and owing on the Bonds

was approximately $18,462,708, plus accrued and unpaid fees and expenses, and any additional

amounts that may be due on the Bonds.

13.     As security for the Bonds, the Bond Trustee has a first lien on and security

interest in, among other things, the Landfill and substantially all of GMM's personal property

including receipts, revenues, income and receivables.

**C.     Facts in Support of the Appointment of a Chapter 11 Trustee**

14.     On August 26, 2010 the Issuer issued the Bonds for the benefit of GMM.

15.     When GMM acquired the Landfill from its prior owner, Walter Minerals, Inc.

("**Walter Minerals**"), Walter Minerals retained certain mineral rights, including rights relating

to mining rock located on the Landfill's property.

16.     On May 25, 2011, GMM entered into a Permit for Rock Removal (the "**GMM**

**Permit**") with Walter Minerals, whereby Walter Minerals granted GMM a permit to mine the

rock at the Landfill – the previously discussed Rock Rights.  In relevant part, the GMM Permit

provided that GMM could crush and remove rock from the Landfill for an initial term of three

years, renewable in three-year increments by agreement of the parties.  The GMM Permit was

terminable at will by either party on 30-days' notice and provided for a royalty payment from

GMM to Walter Minerals of $0.15 per ton for all rock removed or used at the Landfill.

17.     On information and belief, GMM did not file a Memorandum of Permit for Rock

Removal in Jefferson County, Alabama, which Memorandum would have noted the rights under

the GMM Permit on the real estate record of the Landfill.  A copy of the GMM Permit is

attached to the Declaration of Colleen A. Murphy in Support of the Motion for the Appointment

of a Chapter 11 Trustee by UMB Bank, National Association, as Bond Trustee (the "**Murphy**

**Declaration**") as Exhibit A.

18.     On May 14, 2013 and thereafter on May 30, 2013, Jeffrey L. Claunch, a former

manager and operator of GMM and other related entities to him ("**Claunch**"), commenced a

lawsuit against Cowart, GMM and other entities related thereto (the "**Claunch Litigation**") in

the Circuit Court of Jefferson County, Alabama (the "**Alabama Court**").  Among the many

troubling allegations made in the Claunch Litigation is that "[i]n November 2012, Cowart

transferred $40,000 from Green Mountain's business checking account to himself for personal

use in violation of the Indenture and Lease Agreement [documents related to the issuance of the

Bonds], between the [Issuer] and Green Mountain."[1]  *See*, paragraph 24 of First Amended

Complaint (the "**Amended Complaint**") styled "Bluewater Holdings, LLC, Individually And

Derivatively For Vulcan Disposal, LLC And Jeffrey L. Claunch, Individually And Derivatively

For Green Mountain Management, LLC vs. DBC Vulcan Associates, LLC, Daniel B. Cowart,

David Hendricks, Georgia Flattop Partners, LLC, Dan Cowart, Inc.; Vulcan Disposal, LLC,

Tommy Chapman, Trinity-Green Mountain, LLC And Green Mountain Management, LLC As

---

[1] The Bond Trustee intends to explore these allegations in discovery on this Motion, and intends to look into whether Cowart committed any other financial improprieties that would constitute additional grounds for the appointment of a chapter 11 trustee.

Necessary Party Defendants", case no. CV 2013:901902, pending before the Alabama Court.  A copy of the Amended Complaint is attached to the Murphy Declaration as <u>Exhibit B</u>.

19.     In connection with the commencement of the Claunch Litigation, Claunch obtained a temporary restraining order prohibiting Cowart (and the other defendants) from interfering with the operation of Vulcan Disposal, a hauling company that performed work for GMM and was jointly owned by Cowart and Claunch.  Several months later, in September 2013, Judge Blankenship of the Alabama Court issued an order finding that Claunch's "motion for temporary restraining order and to hold Defendants [including Cowart] in contempt [is] . . . well taken and is GRANTED."  In the order, Judge Blankenship further found that "Cowart . . . developed a scheme to terminate the hauling agreement . . . [and that given the facts developed before the court, the Defendants' actions suggested] a pre-textual motive for Defendants' attempted termination of the hauling agreement as opposed to a concern for unpaid invoices."  The Alabama Court also found that "Defendants' willful termination of the hauling agreement violate[d] the consent order [entered on May 29, 2013 in which the parties agreed they would not interfere with each other's respective businesses]."  *See* Order, dated September 27, 2013, issued by the Alabama Court in the Claunch Litigation, a copy of which is attached to the Murphy Declaration as <u>Exhibit C</u>.  In addition, a copy of the motion referenced in the Order is attached to the Murphy Declaration as <u>Exhibit D</u>.

20.     Cowart commissioned Gold Shield Associates, an investigation firm, to prepare an investigative report concerning accounting irregularities at GMM (the "**Gold Shield Report**").  Prior to providing the Bond Trustee with a confidential copy of the Gold Shield Report, GMM provided the Bond Trustee with a summary memorandum prepared by its then consultant/manager, ET Environmental Corporation, LLC ("**ET**").  In the summary

memorandum, ET concluded that "the evidence revealed in the GS [Gold Shield] reports suggest that significant financial wrongdoing has occurred through diversion of funds, over-paying of expenses, miscoding of accounts, improper loans and the like. The net effect of this is to reduce GMM's income and capital base and unfairly compensate VD [Vulcan Disposal] and J. [Jeff] Claunch personally." ET also noted that the financial wrongdoing would cost GMM more than $1.1 million over the time period in question. *See* Confidential Memorandum, dated August 30, 2013, a copy of which is attached to the Murphy Declaration as Exhibit E.

21.    On information and belief, GMM has not pursued the allegations noted in the Gold Shield report, including any attempt to recover the $1.1 million allegedly stolen from the Debtors, either by way of counterclaim in the Claunch Litigation or otherwise, even though the Debtors desperately needed those monies.

22.    On or about June 25, 2013, counsel to GMM contacted counsel to the Bond Trustee to request that the Bond Trustee agree to enter into a forbearance agreement because GMM anticipated that it would be unable to make its August 1, 2013 debt service payment on the Bonds. The Bond Trustee ultimately granted GMM a forbearance on the August 1, 2013 debt service default (the "**Forbearance Agreement**").

23.    On or about July 16, 2013, Cowart formed an entity known as Green Mountain Aggregates, LLC ("**GMA**"), as a Georgia limited liability company.[2] On information and belief, Cowart and his children are the sole owners of GMA. On information and belief, neither GMM nor Flattop holds any equity interest in GMA.

24.    GMA has no employees, nor does it operate any business.

---

[2] Cowart converted GMA to a Delaware limited liability company on September 12, 2013.

25.     Unbeknownst to the Bond Trustee, while the Bond Trustee and GMM were negotiating the Forbearance Agreement, Cowart began negotiations with Walter Minerals for GMA to obtain the Rock Rights, which were already held by GMM.

26.     On August 1, 2013, GMA entered into a Permit for Rock Removal (the "**GMA Permit**") with Walter Minerals (Walter Minerals actually signed the GMA Permit on July 26, 2013) granting to GMA the Rock Rights that previously had been granted to GMM.[3]  The GMA Permit was substantially similar to the GMM Permit, except that it contained much more favorable provisions than the GMM Permit (a 20-year term vs. the 3-year term for GMM; not terminable except for cause as opposed to terminable at will for GMM) and it provided for a royalty of the greater of $0.15 per ton and 2.5% of the gross sales price of the rock.

27.     Also on August 1, 2013, as Cowart was finalizing the transfer of the Rock Rights from GMM to GMA, GMM, as its counsel had said it would, defaulted on the debt service payment on the Bonds.

28.     On August 9, 2013, GMA filed a Memorandum of Permit for Rock Removal in Jefferson County, Alabama, which put GMA's Rock Rights on the real estate record of the Landfill.  A copy of the GMA Permit is attached to the Murphy Declaration as Exhibit F; a copy of the Memorandum of Permit for Rock Removal (the "**GMA Permit Memorandum**") is attached to the Murphy Declaration as Exhibit G.

29.     Effective as of September 4, 2013, the Bond Trustee and GMM entered into the Forbearance Agreement.  The Forbearance Agreement was extended and amended several times, and ultimately expired prior to the Petition Date.

---

[3] Although the Bond Trustee has demanded that Cowart turn over any document purporting to terminate GMM's Rock Rights, Cowart has asserted that no such document exists.

30.     At some point in October, 2013, the Bond Trustee, before it had even heard of GMA, became aware that Cowart had acquired the Rock Rights that permitted a Cowart-owned entity that was unrelated to GMM to mine the rock at the Landfill.

31.     On October 29, 2013, in connection with continuing negotiations regarding an extension of the Forbearance Agreement (and in response to counsel for the Bond Trustee's protestations that obtaining the rock rights in a Cowart-owned entity rather than in GMM constituted usurpation of corporate opportunity), counsel to GMM sent counsel to the Bond Trustee an email in which counsel described the Rock Rights as being held by GMA:

> In furtherance of our conversation, I obtained additional information from my client concerning the mineral rights (attached for your information [attached were, *inter alia*, the GMA Permit and the GMA Permit Memorandum, but not the GMM Permit]). After talking with my client, I am a little surprised that you have not seen this information as I understand that it was previously provided directly to your client. You had previously asked about the cost of obtaining such mineral rights. We understand that GMA was able to secure the rights from Walter Minerals (the prior owner of the property who retained the mineral rights) for no upfront payment. However per the agreement with GMA, Walter Minerals is entitled to receive a royalty equal to the greater of $.15 per ton or 2.5% of the gross sales price per ton for all loads of rock 1) removed and sold from the property and/or 2) used upon the property.

Email from David Wender to Colleen Murphy, dated October 29, 2013 at 12:03 p.m. (the "**Wender Email**"), a copy of which is attached to the Murphy Declaration as Exhibit H. The Wender Email does not mention that GMM previously had (and may have still had at the time of the email) an interest in the Rock Rights.

32.     Also on October 29, 2013, other counsel to GMM sent counsel to the Bond Trustee an email that purported to clarify some issues between GMM and the Bond Trustee. In that email, counsel to GMM stated:

> Dan [Cowart] negotiated with Walter Minerals for the rights to mine quarry rock. He initially did so under a separate entity. [sic] Green Mountain Aggregates ("GMA"), in order to (a) avoid any interest Jeff Claunch might claim if such were negotiated in GMM and (b) recognize that significant equipment would be necessary to crush rock for sale to third parties and that such would not be able to be accomplished through GMM.

Email from Glenn Thomson to Colleen Murphy, dated October 29, 2013 at 3:47 p.m. (the

"**Thomson Email**"), a copy of which is attached to the Murphy Declaration as <u>Exhibit I</u>. As

with the Wender Email, the Thomson Email, did not mention that the Rock Rights were

purportedly transferred from GMM to GMA.

33.     On February 7, 2014, the Forbearance Agreement was extended through May 22,

2014. The extension attempted to give GMM the economic benefit of the Rock Rights through

the following provision:

> <u>Rock Crushing Operations</u>. Certain owners of the Borrower and their family members have formed Green Mountain Aggregates ("GMA") and have entered into a permit for the removal of rock from the owners of the mineral rights (the "Mineral Rights Owners") with respect to the property leased by the Borrower (the "Rock Permit"). In turn, GMA has permitted the Borrower to remove rock consistent with the Rock Permit. The Borrower hereby agrees that: (i) none of the equipment purchased by the Borrower to conduct the current rock crushing operation at the Landfill will be used by GMA for any reason whatsoever (provided, however, that for any period during which GMA uses any equipment of the Borrower all net revenues of GMA will be paid over to the Borrower); (ii) the Borrower will not (a) provide any funding to GMA; (b) procure any equipment for GMA, including signing for or guaranteeing financing for any equipment; or (c) allow its employees to participate in the business of GMA. GMA's business, including its accounting function, will be kept separate from the Borrower. The Borrower will not allow GMA to commence operations at the Landfill until GMA has entered into a use agreement with the Borrower which (i) permits GMA to use the Landfill property only so long as such use does not interfere with the Borrower's operations at the Landfill and (ii) requires GMA (a) to pay to the Borrower, so long as it continues to operate at the Landfill, all of its net revenues (after payment of operating,

tax and other expenses) for deposit with the Trustee if the Borrower's operations at the Landfill do not produce sufficient revenues to pay the amounts owing on the Bonds or for any period during which there is an event of default under the Indenture (regardless of whether such event of default is waived or the subject of a forbearance agreement), and (b) provide the Borrower with all of the stone necessary to operate the Landfill at no charge in excess of the royalties payable to the Mineral Rights Owners and other actual expenses allocable to the production of such stone, but only to the extent that GMA commences rock crushing operations and has the capability of providing such stone.

34.     On July 25, 2014, the Debtors commenced these bankruptcy cases.

35.     On August 4, 2014, the Court entered the Interim Order (A) Authorizing the Debtors' use of Cash Collateral, (B) Granting Adequate Protection to the Indenture Trustee, (C) Scheduling Final Hearing, and (D) Granting Other Related Relief, pursuant to which the Debtors were authorized to use the Bond Trustee's cash collateral subject to, *inter alia*, the budget attached thereto.

36.     Thereafter, GMM and the Bond Trustee began negotiating the terms of a final cash collateral order, and in particular, were discussing a set of milestone dates in connection with a process by which the Debtors could be sold, recapitalized or restructured.

37.     On information and belief, in August and September 2014 the Debtors began the process of attempting to engage an investment banker to pursue a sale or restructuring of the Debtors.  In connection with that process, the Debtors distributed a request for proposals (the "**RFP**") to potential investment bankers.  The RFP requested that candidates submit proposals to assist the Debtors in pursuing a restructuring transaction, and noted that:

the restructuring transaction may involve the assets of an affiliated company, Green Mountain Aggregate.  Green Mountain Aggregate owns certain mineral rights relating to "rock" located in and around the Landfill.  Based on the results of recent testing and conversations, it is believed that these mineral rights have significant value (**which may exceed the value of the Landfill**

**itself**).    Accordingly,    your    proposal    should    also    include information concerning any aggregate/quarry experience that you may possess.

Undated RFP, a copy of which is attached to the Murphy Declaration as Exhibit J (emphasis added).

38.    On September 26, 2014, after several weeks of negotiations, GMM and the Bond Trustee reached agreement on the milestone dates that would enable the Debtors to retain an investment banker, solicit proposals from parties interested in a sale or recapitalization of the Debtors, conduct a process to find the highest and best offer for the Debtors, seek approval of this Court for such offer, and then consummate the offer.  The parties agreed that the entire process would be concluded (*i.e.*, closed) by April 3, 2015 – almost nine (9) months after the Petition Date.  *See* Chain of emails between counsel for GMM and counsel for the Bond Trustee, dated September 26, 2014, a copy of which is attached to the Murphy Declaration as Exhibit K.

39.    After reaching an agreement on the milestones, counsel to the Bond Trustee had a discussion with counsel to the Debtors asking for additional information regarding the Rock Rights, and followed up on that conversation by email on October 3 as follows:

> Also, I wanted to follow up with you on the Green Mountain Aggregates issue that we discussed last week.  I reviewed my files on this and see that GMA obtained the mineral rights, at no cost other than the payment of royalties, just in August 2013.  Can you please let me know who held those mineral rights prior to that date?  Also, why were the rights given to GMA rather than the Debtor?  My understanding is that the Debtor owns all of the rock equipment and has been conducting all operations relating to the rock.  Can you please confirm that?  It probably makes sense for us to schedule a call on this next week once you provide us the relevant information, we need this to be resolved prior to the cash collateral hearing. Thanks.

Counsel to the Debtors replied by email, also on October 3, as follows:

> We have discussed the GMA issues and, this week, GMA has hired counsel to work through these issues with GMM and UMB. Based on preliminary discussions with GMA's counsel, Marshall Martin, I understand that GMA will try to come to a solution that is acceptable to both GMM and UMB. I can confirm that GMM owns all of the equipment currently used for rock/aggregate operations and has been conducting those operations (and has been making the royalty payments to Walter Minerals and keeping all of the remaining proceeds). I have also attached the two documents in my possession relative to the rock permit and GMA – the 2011 permit between GMM and Walter Minerals and the 2013 permit between GMA and Walter Minerals—but will have to defer to GMA's counsel to answer your other questions and discuss what GMA may be willing to do in connection with cash collateral. I will forward your inquiry to Marshall and coordinate a time for us to all speak next week.

*See* Chain of emails between counsel for the Bond Trustee and counsel for the Debtors, dated October 3, 2014, a copy of which is attached to the Murphy Declaration as <u>Exhibit L</u> (the "**Rock Rights Email**"). The Rock Rights Email included a copy of both the GMM Permit and the GMA Permit and so, for the first time, counsel to the Bond Trustee saw that the Rock Rights had first belonged to GMM.

40.     On or around October 10, 2014, after counsel to the Bond Trustee had been provided with proof that Cowart had transferred the Rock Rights from GMM to his own company, and two weeks after the Bond Trustee and GMM had reached agreement on the milestones and just days prior to the scheduled final hearing on cash collateral, counsel to the Bond Trustee was notified that Cowart had instructed GMM to renege on the agreement concerning the milestones. In subsequent discussions, the Bond Trustee was informed that Cowart was insisting that he be given 15 months to attempt to refinance the Bond debt before he would consider a sale process for the Debtors.

41.     Thereafter, counsel to the Bond Trustee, counsel to GMM, GMM's financial advisors, Cowart and Cowart's personal attorney Marshall Martin (who has variously been

described as counsel to Cowart, Dan Cowart, Inc. (a company owned by Cowart), GMA and the

Cowart Family) have had a face-to-face meeting (as described to the Court at the hearing on

October 15, 2014), several telephone calls and have exchanged several term sheets in an attempt

to resolve the issues described in this Motion.  The one non-negotiable requirement of the Bond

Trustee was – and continues to be – that for negotiations to succeed Cowart must immediately

step aside, relinquish all control over the Debtors and allow an independent fiduciary to take the

reins of the Debtors.

42.     These negotiations have not been fruitful because, among other things:

- Cowart has been unwilling to return the ill-gotten Rock Rights to GMM or to at least agree that the parties would reserve the right to attempt to repatriate the Rock Rights to GMM if a sale process does not result in all creditors being paid in full, instead insisting that he was well within his rights to take the Rock Rights for his own personal benefit;

- Cowart and his personal attorney have attempted to speak for GMM by negotiating issues in the term sheet regarding the Bond Trustee's claim, the timing of a sale process and other issues extraneous to GMA, even though, given the blatant conflicts of interest that exist, Cowart and his personal attorney should have limited their roles to speaking to issues relating to GMA's interests; and

- Cowart has refused to unconditionally resign his position at GMM, instead insisting that he should have a veto right over who would replace him as the sole decision maker at GMM.

## ARGUMENT

43.     The appointment of a chapter 11 trustee is warranted in this case pursuant to both

section 1104(a)(1) and section 1104(a)(2) of the Bankruptcy Code.  Section 1104(a) provides, in

relevant part:

At any time after the commencement of the case but before confirmation of the plan, on request of a party in interest or the United States trustee, and after notice and a hearing, the court shall order the appointment of a trustee –

(1) for cause, including fraud, dishonesty, incompetence, or gross mismanagement

of the affairs of the debtor by current management, either before or after the commencement of the case, or similar cause, but not including the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor; or

(2) if such appointment is in the interests of creditors. . . .

11 U.S.C. §§ 1104(a)(1), (a)(2).

44.    A court's decision to appoint a trustee under section 1104(a) is a fact intensive inquiry made on a case-by-case basis.  *In re SunCruz Casinos, LLC*, 298 B.R. 821, 830 (Bankr. S.D. Fla. 2003).  A court may consider the cumulative or collective impact of the conduct and issues raised, whether occurring pre- or post-petition.  *In re Sharon Steel Corp.*, 871 F.2d 1217, 1228 (3d Cir. 1989); *In re Cardinal Indus., Inc.*, 109 B.R. 755, 759-61, 66 (Bankr. S.D. Ohio 1990).

45.    Once a court determines that the movant has met its burden of proving that cause exists under section 1104(a)(1), it must order the appointment of a trustee.  *In re Oklahoma Refining Co.*, 838 F.2d 1133, 1136 (10th Cir. 1988); *In re Veblen West Dairy, LLP*, 434 B.R. 550, 553 (Bankr. D.S.D. 2010) (if cause is found under section 1104(a)(1), the appointment of a trustee is mandatory); *In re SunCruz Casinos*, 298 B.R. at 828 ("Once the court finds that cause exists under § 1104(a)(1), there is no discretion; an independent trustee must be appointed.").[4]

46.    The examples of cause enumerated in section 1104(a)(1) – fraud, dishonesty, incompetence or gross mismanagement – are not exhaustive; a court may find that cause exists for a reason not specifically set forth in the statute.  *In re PHDC, LLC*, 2004 Bankr. LEXIS at *7 (whether "cause" exists under section 1104(a) is not limited to fraud, dishonesty, incompetence

---

[4] Some courts have indicated that grounds for the appointment of a trustee must be established by "clear and convincing" evidence. *See In re G-I Holdings, Inc.*, 385 F.3d 313, 319-21 (3rd Cir. 2004).  The Bond Trustee respectfully submits that in light of Supreme Court precedent and the recent addition of section 1104(e) to the Bankruptcy Code, the better view is that the "preponderance of the evidence" standard applies.  *See In re PHDC, LLC*, 2004 Bankr. LEXIS 1113, *6 (Bankr. N.D. Ga. April 28, 2004) ("There is also authority holding that in light of the Supreme Court's decision in *Grogan v. Garner*, 498 U.S. 279, 112 L. Ed. 2d 755, 111 S.Ct. 654 (1991), the applicable burden of proof under § 1104(a) is preponderance of the evidence.") (because "cause" existed by clear and convincing evidence, the court did not need to decide whether the lesser standard applied).

or gross mismanagement).  Additional factors affecting a court's decision to appoint a trustee include:

> (a) Materiality of the misconduct;
>
> (b) Evenhandedness or lack of same in dealings with insiders or affiliated entities vis-a-vis other creditors or customers;
>
> (c) The existence of pre-petition voidable preferences or fraudulent transfers;
>
> (d) Unwillingness or inability of management to pursue estate causes of action;
>
> (e) Conflicts of interest on the part of management interfering with its ability to fulfill fiduciary duties to the debtor; and
>
> (f) Self-dealing by management or waste or squandering of corporate assets.

*Id.* at *7-8 (*citing In re Intercat, Inc.* 247 B.R. 911, 920-21 (Bankr. S.D. Ga. 2000)).

47.      Even if a bankruptcy court does not find that cause exists to appoint a chapter 11 trustee under section 1104(a)(1), the court may still appoint a trustee pursuant to section 1104(a)(2) if it is in the "interest of the creditors . . . and other interests of the estate " to do so. 11 U.S.C. § 1104(a)(2); *In re Sharon Steel Corp.*, 871 F.2d at 1226; *In re Euro-American Lodging Corp.*, 365 B.R. 421, 428 (Bankr. S.D.N.Y. 2007) ("Unlike § 1104(a)(1), § 1104(a)(2) does not require a finding of fault; the court may appoint a trustee even if no 'cause' exists."). Section 1104(a)(2) provides a more flexible standard for appointment and gives a court discretion to appoint a trustee "when to do so would serve the parties' and estate's interests."  *In re Marvel Entertainment Group, Inc.*, 140 F.3d 463, 474 (3rd Cir. 1998) (*citing In re Sharon Steel*, 871 F.2d at 1226).

## I.    CAUSE EXISTS FOR THE APPOINTMENT OF A CHAPTER 11 TRUSTEE UNDER SECTION 1104(A)(1)

48.      Through section 1104(a)(1) of the Bankruptcy Code, Congress has mandated that a chapter 11 debtor, who acts as a fiduciary of the bankrupt estate, be an honest broker.  *See*

*Commodity Futures Trading Comm'n v. Weintraub*, 471 U.S. 343, 355 (1985) ("[T]he willingness of courts to leave debtors in possession 'is premised upon an assurance that the officers and managing employees can be depended upon to carry out the fiduciary responsibilities of a trustee.'") (citation omitted).

49.     A chapter 11 debtor owes a fiduciary duty to its creditors to protect and conserve property of the estate for the benefit of creditors, and must refrain from acting in a manner which could damage the estate or hinder a successful reorganization of the business.  *See In re Ionosphere Clubs, Inc.*, 113 B.R. 164, 169-70 (Bankr. S.D.N.Y. 1990).  When a debtor in possession and its management have demonstrated an inability or unwillingness to comply with their basic fiduciary duties, Congress saw fit to allow creditors to supplant management while allowing the case to remain in chapter 11 through the appointment of a trustee pursuant to section 1104(a).  *See In re V. Savino Oil & Heating Co., Inc.*, 99 B.R. 518, 526 (Bankr. E.D.N.Y. 1989) ("And if the debtor-in-possession defaults in this respect, Section 1104(a)(1) commands that stewardship of the reorganization effort must be turned over to an independent trustee."). There is no doubt that Cowart, the one person that has complete control over the Debtors' course of conduct in these bankruptcy cases, has engaged in numerous acts amounting to dishonesty, fraud, gross mismanagement, and self-dealing that mandate the appointment of a chapter 11 trustee.

### A.  A Chapter 11 Trustee Is Warranted Because Cowart Defrauded GMM And Its Creditors By Transferring GMM's Rock Rights To GMA.

50.     The improper and fraudulent transferring of GMM's Rock Rights by Cowart to GMA clearly demonstrates the need for the appointment of a chapter 11 trustee in these cases to rectify this massive fraud on GMM and its creditors.  Specifically, Cowart identified what he thought was a valuable asset (indeed, according to the RFP, an asset perhaps more valuable than

the Landfill itself), the Rock Rights, and caused GMM to invest significant funds in exploring and developing those rights, including significant resources for purchasing or leasing equipment to mine the rock, significant use of employee labor to exploit the rock, and significant funds to conduct necessary testing on the rock, and obtaining a license in favor of GMM for those rights. Cowart then snatched away those rights for his own benefit, after utilizing GMM resources to ensure their value. Adding insult to injury, the license Cowart negotiated for GMA was significantly better than the license he had negotiated for GMM (and it is difficult to believe that, had they been asked, Walter Minerals would not have provided GMM the same deal that it provided GMA, which was nothing more than a shell company when it retained the Rock Rights). Not only did Cowart do all of this without compensating GMM in any manner, but he also saddled GMM with all of the expenses associated with testing and exploiting the rock.

51. Cowart committed a fraudulent, deceitful, self-serving act when he moved the Rock Rights from GMM to GMA. Once exposed to the light of day, the scheme becomes clear. And it is clear that Cowart specifically transferred the Rock Rights from GMM to GMA because he did not want GMM's creditors to receive the benefit of the Rock Rights. This is borne out by both the Thomson Email (Cowart obtained the Rock Rights in GMA's name "to (a) avoid any interest Jeff Claunch [one of the plaintiffs in the Claunch Litigation] might claim if such were negotiated in GMM" and the timing of the transfer—right before the Bond debt went into default, which would have enabled the Bond Trustee to exercise remedies against the Landfill, including foreclosure.[5] There can be little doubt as to Cowart's motives here. Indeed, Cowart has <u>admitted</u> that one of the purposes of the Rock Rights transaction was to divert assets from the Debtors, to keep those assets outside the reach of the Debtors' creditors.

---

[5] Indeed, Cowart's transfer of the Rock Rights from GMM to GMA harmed not only GMM's creditors, but also equity holders of GMM other than Cowart (and his children).

52.     On information and belief GMA has no employees or operations or assets other than the GMA Permit.  GMA does not sell any rock.  Rather, Cowart made GMM purchase or lease the equipment that is used to excavate rock and now GMM mines rock that it uses in its landfill operations.  Moreover, GMM pays the royalty payments due under the GMA Permit. Functionally, GMM conducts itself as if it still had the GMM Permit – it has the excavating equipment, its employees mine the rock, and GMM uses the rock and pays the royalty – but GMA and not GMM now has the Rock Rights.

53.     Although the Bond Trustee has repeatedly requested that Cowart return the Rock Rights to GMM, Cowart has continually refused to do so. Instead, on information and belief, Cowart has been attempting to divest 50% of GMA into a joint venture thereby monetizing the Rock Rights for his personal benefit.  These activities support the Bond Trustee's position that Cowart set up GMA to defraud GMM and its creditors for his own benefit.  Cowart converted the Debtors' corporate opportunity for his own personal benefit by effectuating the transfer of a valuable asset of the Debtors to his family-owned affiliate for no consideration.  Put simply, the Rock Rights transactions directly benefitted Cowart and his children at the estates' expense. This type of self-dealing, mismanagement, and fraudulent behavior justifies the appointment of a trustee. *See In re McCorhill Publishing, Inc.,* 73 B.R. 1013, 1017-18 (Bankr. S.D.N.Y. 1987) (mismanagement warranted appointment of trustee where management had conflicting interests in affiliated companies and had engaged in self-serving transactions which benefitted the affiliated companies and their own interests); *In re V. Savino Oil and Heating Co.,* 99 B.R. at 526 (debtor's efforts to place its assets beyond the reach of creditors through prepetition transfers constituted cause to appoint a trustee).

54.     Cowart's actions with regard to the Rock Rights provide ample justification for the appointment of a chapter 11 trustee for cause under section 1104(a)(1) of the Bankruptcy Code.

### B. A Chapter 11 Trustee Is Needed To Recover The Rock Rights From GMA For The Benefit Of GMM And Its Creditors.

55.     Cowart has asserted, directly and through the Thomson Email, that he transferred the Rock Rights to GMA in order to protect GMM and its creditors from the litigious Claunch. But notwithstanding the Bond Trustee's repeated requests that Cowart return the Rock Rights to GMM now that the company is protected by its bankruptcy filing, Cowart has refused to do so. The Debtors owe a fiduciary duty to their creditors to seek the return of the Rock Rights to GMM, but it is apparent that Cowart, who completely controls the Debtors, will not allow the Debtors to fulfill that fiduciary duty. A chapter 11 trustee should therefore be appointed to pursue the recovery of the Rock Rights.

56.     A debtor in possession has a fiduciary duty to creditors to pursue estate causes of action, including fraudulent transfer actions. *In re Veblen West Dairy LLP*, 434 B.R. at 555. A debtor's prepetition transfer to a related company is automatically suspect and requires a heightened level of scrutiny to ensure its appropriateness. *See, e.g., In re Zambrano Corp.*, 478 B.R. 670, 691 (Bankr. W.D. Pa. 2012) (reviewing transfers between related entities with "particular scrutiny"). It is unsurprising then that courts have consistently held that a "history of transactions between the debtor and related companies can . . . serve as cause for the appointment of a trustee under § 1104(a)(1). . . ." *Id.* (*citing In re Oklahoma Refining Co.,* 838 F.2d 1133, 1136 (10th Cir. 1988)). An obvious conflict exists if a debtor was involved in a prepetition transfer, and is now required to seek its avoidance. *In re Intercat, Inc.* 247 B.R. at 920-21 (outlining, *inter alia*, three considerations for appointment of a trustee: (1) the existence

of pre-petition voidable preferences or fraudulent transfers; (2) unwillingness or inability of management to pursue estate causes of action; and (3) conflicts of interest on the part of management interfering with its ability to fulfill fiduciary duties to the debtor).  This conflict is especially dangerous to creditors if, as here, the debtor was not only involved in the prepetition transfer, but was also its beneficiary.  *See Intercat*, 247 B.R. at 921 (*citing In re Sharon Steel Corporation,* 871 F.2d 1217 (3d Cir. 1989) (upholding the lower court's appointment of a trustee because current management was unable to fulfill its fiduciary duty to pursue prepetition voidable transfers because the debtor corporation and the recipient corporations had common management and those managers had conflicting duties)).

57.    Here, Cowart's conflict is immediately apparent.  He and his children own GMA. He obtained superior Rock Rights for GMA at the same time he either terminated GMM's Rock Rights or intentionally let them lapse.  Cowart continues to refuse to return the Rock Rights. Instead, he has attempted to monetize a portion of those rights – rights that rightfully belong to GMM – to third parties for his own personal gain.  Cowart cannot now be expected (or trusted) to fulfill his fiduciary duty to evaluate and reverse the very transactions of which he was the driving force and the beneficiary.  It is not surprising, given his efforts to personally benefit from the stolen Rock Rights, that he now will not direct GMM to pursue recovery of the Rock Rights. Only an independent fiduciary – a chapter 11 trustee – will not be conflicted about suing Cowart and GMA for the Rock Rights.  *See In re Veblen*, 434 B.R. at 554-56 (finding that an independent entity (trustee) is necessary to assess the case for possible voidable prepetition preferences and fraudulent or constructively fraudulent transfers after numerous prepetition transfers between the debtor and related entities were identified).

### C. A Chapter 11 Trustee Is Needed Because Cowart's Diversion Of The Debtors' Employees And Equipment To GMA, Free of Cost, Constitutes Gross Mismanagement.

58.      In addition to the fraud, self-dealing and conflicts of interest noted above, Cowart

has displayed gross mismanagement of GMM.  Gross mismanagement of the debtors' assets is

grounds for appointment of a trustee.  *See In re Ionosphere Clubs, Inc.,* 113 B.R. at 168

("continuing mismanagement of the affairs of a debtor after the filing date is evidence of the

need for the appointment of a trustee.").  Cowart's mismanagement is demonstrated by his

consistent diversion of the Debtors' employees and equipment to further GMA's efforts to

exploit the Rock Rights —without compensation.  Cowart needs to be displaced by a chapter 11

trustee who will pursue appropriate compensation from GMA for past and future use of the

Debtors' equipment and employees.  Further, Cowart is an investor in the Landfill, not an

operator.  For so long as he has owned the Landfill he has hired an operator or consultant to run

the operations of the Landfill, because he does not have the experience to do so himself. He has

also taken or accrued substantial sums in alleged compensation for his role as the Chairman of

GMM, with no benefit (only harm) to GMM, as demonstrated above.  The Debtor needs a

chapter 11 trustee who understands its business and who can maximize its value.

59.      Cowart cannot now attempt to solve these problems and cure these deficiencies;

only Cowart's prior actions are relevant to this Motion. *See In re La Serene, Inc.*, 3 B.R. 169,

175 (Bankr. N.D. Ga. 1980) ("Future plans, revealed by current management through testimony

or much harder evidence, will not condone past management frauds, dishonesty, gross

mismanagement, or incompetence so as to overcome the statutory requirement of Section

1104(a)(1) for the appointment of a trustee.").  The abuses Cowart has thrust upon GMM can be

stopped only by the appointment of a chapter 11 trustee.  Accordingly, the Bond Trustee requests

that the Court dispossess Cowart from his role as Chairman of GMM and appoint a chapter 11

trustee to assume the decision-making role for GMM.

### D. A Chapter 11 Trustee Is Needed Because Creditors Have Lost Faith In Cowart And The Acrimony Between The Creditors And Cowart Is Harmful To The Reorganization Process.

60.    Cowart's actions concerning the Rock Rights and his refusal to negotiate

meaningful milestones toward an endgame for the Debtors have led to a complete breakdown in

relations between GMM and the Bond Trustee.  The Debtors have been in bankruptcy for over

three (3) months and there has been no appreciable movement toward a plan to exit bankruptcy.

The Debtors have indicated that they cannot continue to operate without a substantial cash

infusion and they cannot afford to languish in bankruptcy for any significant period of time.  A

chapter 11 trustee should be appointed so that negotiations can restart and these bankruptcy cases

can move toward conclusion.

61.    Courts have appointed chapter 11 trustee when the relationship between the

debtor and its major creditors have reached an impasse.  *See In re Celeritas Techs., LLC*, 446

B.R. 514, 519 (Bankr. D. Kan. 2011) ("Acrimony between debtor and creditor which impedes

the reorganization effort is cause to appoint a Chapter 11 trustee.").  Courts have held that

acrimony between the debtor and creditors in a bankruptcy case can rise to the level of "cause"

necessitating the appointment of a trustee under section 1104(a)(1).  *See In re Intercat, Inc.*, 247

B.R. at 921 (*citing In re Marvel Entertainment Group*, 140 F.3d at 474 (district court's

appointment of a trustee did not constitute an abuse of discretion when the court found that

severe acrimony between the debtor and its creditors had risen to level of "cause," necessitating

such appointment)).  For instance, in *In re Marvel Entertainment Group*, the court found that the

debtor's conflicts of interest created animosity between debtor and lenders and caused the

lenders to lose confidence in the debtor's ability to act as a fiduciary.  *In re Marvel*

*Entertainment Group*, 140 F.3d at 473-74.  The court noted that the "intense and high-stakes bickering between the [debtor] and the Lenders does not instill confidence that the [debtor] could fairly negotiate with the creditors to whom [the debtor] owe[s] these duties, nor that reorganization will occur effectively."  *Id*. at 474.  Accordingly, the court found that the bankruptcy process would be hindered without a disinterested administrator at the helm.  *Id*.

62.     Here, the Bond Trustee is the largest creditor in these cases, comprising approximately 93% of all scheduled claims and holding a security interest in all of Debtors' assets.   Cowart has lied to the Bond Trustee by attempting to cover up the fact that GMM once held the Rock Rights and has defrauded the Bond Trustee with respect to the Rock Rights.  In addition, Cowart has reneged on the milestone dates to which he initially agreed and then disavowed in favor of a strategy designed to entrench his influence over and his position at the Debtors.  Given his lies and other questionable conduct the Bond Trustee simply cannot negotiate with Cowart any longer.  And certainly, based upon his previous actions, it is highly doubtful that Cowart, as the leader of GMM, can transition from the position of a conflicted, self-interested fraudster to the objective fiduciary that he is required to be throughout this bankruptcy.  *See generally In re Nartron Corp.*, 330 B.R. 573, 590 (Bankr. W.D. Mich. 2005).

63.     The level of acrimony between the Bond Trustee and Cowart will almost certainly impede reorganization efforts and that alone is sufficient to find cause under § 1104(a)(1).  Negotiations in this case are at a standstill.  The sole reason for this is Cowart's continued involvement.  Cowart's continuous devious behavior and mismanagement, and his clear conflicts of interest, jeopardize these bankruptcy cases. The Bond Trustee is willing to continue productive negotiations with the Debtors as soon as Cowart is removed, and an unbiased, competent fiduciary is appointed to run the Debtors' business.  These cases desperately need the

involvement of an independent fiduciary to prevent the losses Cowart is visiting upon the

Debtors and their creditors.

## II.    APPOINTMENT OF A CHAPTER 11 TRUSTEE IS IN THE BEST INTERESTS OF CREDITORS AND THE ESTATE.

64.    Independent of the "cause" analysis under section 1104(a)(1), a court can appoint

a trustee if such appointment is in the best interest of creditors and other parties in interest.  11

U.S.C. § 1104(a)(2).  In determining whether a trustee should be appointed under section

1104(a)(2), courts "look to the practical realities and necessities." *In re Ionosphere Clubs, Inc.*,

113 B.R. at 168.  Among the factors considered by the court are: "(i) the trustworthiness of the

debtor; (ii) the debtor in possession's past and present performance and prospects for the debtor's

rehabilitation; (iii) the confidence – or lack thereof – of the business community and of creditors

in present management; and (iv) the benefits derived by the appointment of a trustee, balanced

against the cost of appointment." *Id.* (internal citations omitted); *see also In re Euro-American

Lodging Corp.*, 365 B.R. 421, 427 (Bankr. S.D.N.Y. 2007); and *In re Marvel Entertainment

Group*, 140 F.3d at 474 (section 1104(a)(2) envisions a more flexible standard).

65.    Here the cost/benefit analysis weighs clearly in favor of replacing Cowart.  First,

this is not the typical scenario where a debtor's prepetition management remain in control

postpetition, carrying with them their experience and expertise.  Cowart is simply an investor;

the Debtors are no more to him than an investment.  Cowart is not necessary for the operations of

the Debtors and does not have the experience to operate the Debtors.  For the entire history of the

Debtors' operations (both pre- and post-petition), Cowart hired managers and consultants to run

the business.  In fact, in the Official Statement circulated in connection with the issuance of the

Bonds, Cowart's experience is described as follows:

> Daniel B. Cowart ("Cowart"), age 50, is a native of Atlanta and is a 1981 graduate of the University of Georgia with a Bachelor's of Business Administration in Real Estate. He is also a 1977 graduate of the Marist School. During a 27 year career in real estate, he has developed over 1,700 residential lots in North Fulton, South Forsyth, and Gwinnett counties. Cowart formed DCI in 1991 and has been its president ever since. During this time, he was also Vice President of Jim Cowart, Inc. and President of DDCB, Inc. from 1982 from 1994. In addition to residential communities, Cowart has developed and owned several office and retail shopping centers in Georgia and investment property in Alabama. Cowart has non-real estate interests which include commercial banking, outdoor advertising and technology companies in addition to the Project. Cowart is active in the community, devoting time and resources to serving on numerous boards, including Wesleyan School, and Touchmark National Bank.

Official Statement, dated August 23, 2010, executed and delivered by GMM, p.11.  A copy of the cited page is attached to the Murphy Declaration as Exhibit M.  Any interested party may obtain a full copy of the Official Statement by contacting counsel for the Bond Trustee.  From this description, which was provided by GMM, it is clear that Cowart is a real estate developer with absolutely no experience operating a landfill facility or any comparable business.

66.    In stark contrast to the description of Cowart in the Official Statement – which listed no experience running or managing landfills at all – the description of Jeff Claunch in the Official Statement has 6 paragraphs devoted to his extensive landfill and recycling experience, and makes it clear that it was Claunch, and not Cowart, that had the requisite landfill experience for GMM.  *Id.* at p.12.  It is beyond doubt Cowart's continued involvement in the Debtors' operations is not necessary because he does not have the experience necessary to run the landfill and there is thus little to no benefit to his remaining in control of the Debtors.

67.    As with the section 1104(a)(1) analysis, courts have found that acrimony between creditors and the debtor justify appointment of a trustee under section 1104(a)(2).  For instance, in *In re Marvel Entertainment Group*, the district court found that the level of acrimony justified

appointment of a trustee under both sections 1104(a)(1) and (a)(2).  *In re Marvel Entertainment Group*, 140 F.3d at 474-75.  There, the Third Circuit explained that even if it was of the view that appointment of a trustee was not mandated by the level of acrimony under section 1104(a)(1), the district court's determination would come within the proper exercise of discretion under the flexible section 1104(a)(2) standard.  *Id.* at 474.

68.    In *In re Concord Coal Corp.*, 11 B.R. 552, 554 (Bankr. S.D. W. Va. 1981), the Court found that the appointment of a trustee under section 1104(a)(2) was justified for two reasons.  First, substantial doubt existed as to whether the debtor's current management could be considered loyal to its goal of rehabilitation because management had many competing business interests and there was a potential for inter-company dealing favoring those interests.  *Id.* Second, there was substantial doubt as to whether management could gain and maintain the confidence of secured creditors and lenders sufficiently to continue the debtor's operations.  *Id.* This was in part due to a series of prepetition transfers by debtor's management to related entities, and the fact that management was currently facing litigation in other courts as a result of other matters.  *Id.*

69.    Similarly, in *In re The Bible Speaks*, 74 B.R. 511 (Bankr. D. Mass 1987), the court found that friction between the debtor and creditors' committee threatened to engulf the estate in costly bickering over the entire range of the reorganization process and that any plan consummation would require cooperation between the committee and debtor representatives, "a spirit that [was] unlikely to be present if the Debtor remain[ed] as a debtor in possession."  *Id.* at 512-13.  The court found that the need for a neutral party to mediate disputes between the debtor and its creditors was grounds for a trustee's appointment under 1104(a)(2).  *Id.*

70.    In this case, Cowart's prepetition involvement in the Rock Rights transactions is a source of great controversy.  There is little doubt that his determination to avoid that transfer and recover those assets for the benefit of the estate is compromised since the estate's gain is invariably his personal loss—something of a "fox guarding the henhouse" situation.

71.    Finally, the Debtors require the use of cash collateral, and have indicated to the Bond Trustee their desire to seek a $2 million priming loan.  The amicable and rapid resolution of these issues is necessary to maintain and complete the reorganization process.  The Bond Trustee is willing to participate in these negotiations, subject to Cowart's removal.  Absent Cowart's removal, the Bond Trustee will vigorously resist any attempt by the Cowart-led Debtors to continue to use cash collateral and/or prime the Bond Trustee's liens.  As emphasized above, Cowart is the roadblock to these negotiations, and his removal would be a benefit to all parties in these cases.  The Court in *In re Ionosphere Clubs, Inc.* had the opportunity to consider a similar situation.  *In re Ionosphere Clubs, Inc.,* 113 B.R. at 171.  In *Ionosphere*, the Creditors' Committee indicated that they would contest the use of escrowed unencumbered cash necessary for the continued operation of the Debtor, unless a trustee was appointed.  The Court held that, for this reason alone, "the interests of creditors, preferred shareholders, employees, and the flying public (debtor was in the aviation business) [were] better served by an order appointing an operating trustee." *Id*.

72.    In sum, the acrimony between Cowart and the Bond Trustee, sparked by the many issues identified herein, is the insurmountable hurdle holding back these cases from a successful conclusion.  Appointing a chapter 11 trustee would provide the Debtors with a true fiduciary to the bankruptcy estates.  Such a fiduciary is necessary to work with creditors, recover and preserve assets for the reorganization of the Debtors, and provide payment to creditors.

3494276_1

## CONCLUSION

73.     For the foregoing reasons, the Bond Trustee requests this Court (i) find that cause exists to remove Cowart as Chairman of GMM; (ii) find that removal of Cowart as Chairman of GMM is in the best interest of the parties in interest in these cases; (iii) authorize the United States Trustee to appoint a chapter 11 trustee; and (iv) grant such further relief as is appropriate under the circumstances.

Respectfully submitted this 3rd day of November 2014.

**MINTZ, LEVIN, COHN, FERRIS, GLOVSKY & POPEO, P.C.**

By:  */s/ Kevin J. Walsh*
Kevin J. Walsh
Pro hac vice admission granted
KWalsh@mintz.com
Colleen A. Murphy
*Pro hac vice* admission granted
CAMurphy@mintz.com

One Financial Center
Boston, MA  02111
Tel:  (617) 542-6000

*and*

**PARKER, HUDSON, RAINER & DOBBS LLP**

By:  */s/  Eric W. Anderson*
Eric W. Anderson
Georgia Bar No. 016810
eanderson@phrd.com

285 Peachtree Center Ave.
Suite 1500
Atlanta, Georgia 30303
Tel: (404) 523-5300
Fax: (404) 522-8409

*Counsel UMB Bank, N.A., as Indenture Trustee*