

**IT IS ORDERED as set forth below:**

**Date: September 27, 2023**

_____

**Barbara Ellis-Monro**
**U.S. Bankruptcy Court Judge**

_____

## UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

IN RE:

GREEN MOUNTAIN MANAGEMENT, LLC
et al.,

                    Debtors.

CASE NO. 14-64287-BEM

CHAPTER 11

## O R D E R

### I. Background

   This matter is before the Court on Movants' *Motion to Reopen or, in the Alternative, for Hearing* (the "Motion to Reopen" or "Motion"), in which Movants[1] allege that improper conduct altered the Court's orders and judgment and thus constitutes fraud on the court and ask that the case be reopened and the facts heard. [Doc. 469]. Big Sky Environmental, LLC ("Big Sky") and UMB Bank, N.A., ("UMB") filed responses [Docs. 481, 482], and Movants filed

---

[1] The Motion states that it is "brought on behalf of Debtors and the owners of Debtors, to include the members and descendants of the families of James H. Cowart and Daniel B. Cowart, Sr., their estates, and certain key investors, employees, and beneficiaries of Debtors." [Doc. 469 at 2 n.1].

replies. [Docs. 492, 493]. Having considered the papers and the applicable authorities, the Court will deny the Motion on the basis of futility.

These bankruptcy cases were filed on July 25, 2014. [Doc. 1]. At that time, Daniel B. Cowart ("Cowart") was the sole member of Debtor Georgia Flattop Partners, LLC ("Georgia Flattop"), which was the managing member of Debtor Green Mountain Management, LLC ("GMM"). [Doc. 1 at 10]. GMM owned and operated a landfill in Adamsville, Alabama. [Doc. 32]. Development of the landfill was funded in 2010 by $17 million in bonds issued by the Solid Waste Disposal Authority of the City of Adamsville with UMB Bank, N.A., ("UMB") as the indenture trustee for the bonds. [Id.]. The bonds were purchased by the Nuveen High Yield Municipal Bond Fund and Nuveen Municipal High Income Opportunity Fund (collectively, and with their investment advisor Nuveen Asset Management, LLC, "Nuveen"). [Id.]. GlassRatner Advisory & Capital Group, LLC ("GlassRatner") was appointed as financial advisor and investment banker to Debtors. [Doc. 86]. UMB filed a motion to appoint a trustee, alleging mismanagement, self-dealing, and fraud by Cowart. [Doc. 108]. Among other things, UMB alleged impropriety in the transfer of GMM's right to mine rocks on the landfill property ("Rock Rights") to Green Mountain Aggregates, LLC ("GMA"), which was formed by Cowart. [Id.]. UMB's motion was resolved by a consent order under which Lee Katz of GlassRatner replaced Cowart as manager of GMM, with full decision-making and operational authority over Debtors, and GlassRatner's employment as financial advisor and investment banker was terminated. [Doc. 124]. The consent order incorporated a term sheet, which Cowart signed in his individual capacity and as a representative on behalf of GMM, Georgia Flattop, and GMA. [Id. Ex. A].

On May 14, 2015, Cowart, Dan Cowart Companies, and GMA filed a motion to appoint a trustee and to terminate the employment of Katz and GlassRatner, alleging that Katz was

improperly conducting a sale process by acting outside the scope of his authority and alleging that Debtors' business was deteriorating under his management. [Doc. 245]. After an evidentiary hearing on June 4 and June 10, 2015, the Court denied the motion to appoint a trustee. [Doc. 287].

On August 18, 2015, the Court entered an *Order (I) Authorizing the Sale of Substantially All of the Debtors' Assets Free and Clear of Certain Liens, Claims, Encumbrances and Interests, (II) Authorizing the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, and (III) Granting Certain Related Relief* by which Big Sky acquired Debtors' assets over the objections of Cowart, the Dan Cowart Companies, and GMA (the "Sale Order"). [Docs. 372, 361]. The case was dismissed on August 1, 2016, and closed on August 25, 2016. [Doc. 465].

It appears that Movants contend the Sale Order was procured by fraud. The Motion does not specify the alleged fraud, but instead relies on an unsigned memo by attorney Gene Chapman to Dan Cowart, Sr., dated April 27, 2020, with the subject line: "Analysis of case to set aside judgment for fraud on the court" and various attached exhibits (the "Chapman Report") [Doc. 469-1], as well as a May 6, 2015 letter from Frank W. DeBorde as counsel for Cowart, the Cowart Companies, and GMM to Debtors' then-counsel Alston & Bird, LLP, asserting that Alston & Bird had a conflict of interest in its representation of Debtors,[2] [Doc. 469-2] and correspondence from Cowart and his representatives to David Weidenbaum, an attorney for the United States Trustee, regarding the alleged fraud and reopening the bankruptcy case. [Doc. 469-3]. The Chapman Report includes the following disclaimer:

> I have not done any independent investigation into the facts of this matter. I have set forth my understanding of the facts after reviewing documents provided to me and discussions with Dan Cowart, Sr. and Daniel Cowart. Further, I do not claim any expertise in bankruptcy law but I believe the authorities cited are good law as to the holdings and principles.

---

[2] Alston & Bird subsequently withdrew as counsel for Debtors. [Doc. 265].

[Doc. 469-1 n.1]. Pages 15-16 of the Chapman Report list various facts that the author suggests could have affected the Court's decision to approve the sale of assets.

Movants do not propose to undo the transfer of assets that occurred pursuant to the Sale Order but seek to be made whole and placed in the same financial position they would be in today if the alleged fraud had not occurred.[3] [Doc. 469 at 7]. To do this, Movants propose to empanel a jury to determine the amount of their loss. [Doc. 492 at 3].

## II. Legal Standard

The Bankruptcy Code provides that a bankruptcy case may be reopened on the motion of a party in interest "to administer assets, to accord relief to the debtor, or for other cause." 11 U.S.C. § 350(b); Fed. R. Bankr. P. 5010. "[T]he bankruptcy court retains broad discretion to reopen a closed case" under § 350(b). *Slater v. United States Steel Corp.*, 871 F.3d 1174, 1186 (11th Cir. 2017). Furthermore, "[a]s a matter of law, there is no question that bankruptcy courts may rule on motions to reopen without a hearing." *Redmond v. Fifth Third Bank*, 624 F.3d 793, 798-99 (7th Cir. 2010). Neither § 350(b) nor Rule 5010 requires such a hearing. Movants bear the burden to show a basis for reopening the case. *Matter of Delisfort-Crisostomo,* No. 14-69797-LRC, 2018 WL 5994715, at *1 (Bankr. N.D. Ga. Nov. 14, 2018) (Ritchey Craig, J.); *In re Group Mgmt. Corp.*, No. 03-93031, 2022 WL 14929963, at *16 (Bankr. N.D. Ga. Oct. 24, 2022) (Hagenau, J.).

"The Court must consider the facts presented in each case and use its discretion to determine whether cause exists to reopen the case." *In re Tarrer*, 273 B.R. 724, 732 (Bankr. N.D. Ga. 2001) (Drake, J.). In doing so, courts consider the benefit to the debtor, the prejudice or

---

[3] Movants contend that because they are not seeking to undo the transfer, Big Sky does not have standing to oppose the Motion. [Doc. 492 at 1-2].

detriment to the affected parties, the benefit to creditors, and other equitable factors such as "the availability of relief in another forum, whether the estate has been fully administered, and the length of time between the closing of the case and the motion to reopen." *In re Arana*, 456 B.R. 161, 172 (Bankr. E.D.N.Y. 2011); *Tarrer*, 273 B.R. at 732. Another important factor is whether the movant would be entitled to relief if the case were reopened. *See Redmond*, 624 F.3d at 798; *In re UAL Corp.*, 809 F.3d 361, 364 (7th Cir. 2015). The Court will not reopen a case when doing so would be futile. *Delisfort-Crisostomo,* 2018 WL 5994715, at *1; *accord In re Diamond*, 698 F. App'x 571, 574 (11th Cir. 2017) (bankruptcy court did not abuse its discretion in denying a motion to reopen because "even if the bankruptcy case was reopened, the bankruptcy court could not afford the relief [the debtor] has requested"); *see also In re Galloway-O'Connor*, 539 B.R. 404, 407 (Bankr. E.D.N.Y. 2015) ("[A]lthough a motion to reopen is generally considered a 'ministerial act,' in determining whether to grant the motion, it is appropriate for the Court to review the legal merits of the relief sought upon reopening.").[4] Additionally, the Eleventh Circuit Court of Appeals has said the "other cause" provision of § 350(b) "incorporates the standards of Rule 60(b)," which allows a party relief from a final judgment for various reasons, including "newly discovered evidence, fraud or misrepresentation, the judgment is void or has been discharged or vacated, and 'any other reason that justifies relief.'" *In re Mohorne*, 772 F. App'x 846, 847 (11th Cir. 2019) (quoting Fed. R. Civ. P. 60(b)).

---

[4] The Motion to Reopen was initially served via ECF "upon all parties registered to receive notice thereby" even though the case had been closed since 2016. [Doc. 472]. When no responses were timely filed despite allegations of fraud against attorneys and because of the length of time the case had been closed, the Court directed Movants' counsel to serve those accused of wrongdoing. [Doc. 475]. Counsel did so, but also responded to the Court's order, stating that "Rule 60 does not require the appearance and involvement of all parties who participated in the alleged fraud on the Court." [Doc. 477]. Whatever the scope of the Court's jurisdiction, the Court must consider appropriate due process safeguards given that the Motion is ultimately seeking to pursue significant damages, presumably from the alleged wrongdoers. While reopening a case may be a ministerial act, in this case doing so would open the door to potentially costly and burdensome litigation. In such circumstances, the alleged wrongdoers should have an opportunity to contest reopening of the case. And after the service required by the Court, two parties did so.

Here, Movants seek to reopen the case so they can pursue a claim for relief from the Sale Order based on fraud on the court under Federal Rule of Civil Procedure 60(d)(3), made applicable in bankruptcy by Federal Rule of Bankruptcy Procedure 9024. Specifically, Rule 60(d)(3) provides that Rule 60 "does not limit a court's power to: … set aside a judgment for fraud on the court." Fed. R. Civ. P. 60(d)(3). As a result, a motion under Rule 60(d)(3) may be brought at any time. *Council v. American Fed'n of Gov't Emps. (AFGE) Union*, 559 F. App'x 870, 872 (11th Cir. 2014).

Fraud on the court is "a narrow doctrine and constitutes only that species of fraud that defiles, or attempts to defile, the court itself, or is a fraud perpetrated by officers of the court so that the judicial machinery cannot perform in the usual manner its impartial task of adjudging cases." *Hunt v. Nationstar Morg., LLC*, 779 F. App'x 669, 671 (11th Cir. 2019) (citations and internal quotation marks omitted). "[T]he alleged fraud must go beyond mere discrepancies in the record evidence available at the time judgment was entered. The fraud must have been the kind of fraud that ordinarily could not be discovered, despite diligent inquiry, within one year or even many years." *Kennedy v. Schneider Elec*., 893 F.3d 414, 420 (7th Cir. 2018). In addition, to establish fraud on the court, the fraud must be shown by clear and convincing evidence of:

> [t]he most egregious misconduct, such as bribery of a judge or members of a jury, or the fabrication of evidence by a party in which an attorney is implicated. ... Stated differently, the movant must show an "unconscionable plan or scheme" to improperly influence the court's decision. Fraud between the parties does not constitute fraud on the court, as it does not carry the same threat of public injury.

*Gupta v. Walt Disney World Co*., 482 F. App'x 458, 459 (11th Cir. 2012) (quoting *Rozier v. Ford Motor Co*., 573 F.2d 1332, 1338 (5th Cir. 1978) and citing *S.E.C. v. ESM Group, Inc*., 835 F.2d 270, 273 (11th Cir. 1988)). "[C]onclusory averments of the existence of fraud made on information and belief and unaccompanied by a statement of clear and convincing probative facts which

support such belief do not serve to raise the issue of the existence of fraud ....” *Booker v. Dugger*, 825 F.2d 281, 283-84 (11th Cir. 1987) (citations omitted).

In cases in which fraud on the court has been established, it most often arises out of deceit by attorneys or other officers of the court. The authorities show that there must be a knowing omission that resulted in a judgment or order or a knowing scheme of commission. *See Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238, 64 S. Ct. 997 (1944) (district court did not rely on article authored by attorney and stated to be authored by expert, but circuit court did, and ruled in favor of party submitting false article; when the false authorship was uncovered, it was found to constitute fraud on the court); *In re Bressman*, 874 F.3d 142 (3d Cir. 2017) (affidavit of damages submitted by attorney for plaintiffs in support of a default judgment failed to disclose a settlement with co-defendants; the court found the omission constituted fraud on the court and vacated default judgment); *In re Eastern Fin. Corp. v. ISC Alchevsk Iron and Steel Works*, 258 F.R.D. 76 (S.D.N.Y. 2008) (counsel knowingly failed to disclose relevant information to court about potentially naming the wrong defendant and that claim was subject to a foreign bankruptcy proceeding in obtaining default judgment; the court set aside the default judgment due to fraud on the court); *Pumphrey v. K.W. Thompson Tool Co.*, 62 F.3d 1128 (9th Cir. 1995) (where general counsel of gun company failed to disclose adverse video evidence in a wrongful death case, gave misleading answers to discovery requests, and failed to correct false testimony by the gun company's expert witness, there was fraud on the court); *Matter of Tudor Assoc., Ltd., II*, 64 B.R. 656 (E.D.N.C. 1986) (principal of a debtor-in-possession under former chapter XII committed fraud on the court in obtaining an order to sell property by misrepresenting that the property was subject to a large mortgage that would be cancelled upon the sale).

### III. Analysis

Movants have failed to show a basis for reopening the case because even if all the allegations in the Chapman Report are true, they fail to make a prima facie showing of fraud on the court. Therefore, reopening the case would be futile because the Court can provide no relief to Movants.

The Chapman Report lists "Factors to consider regarding the Claim" including ten reasons the Court approved the sale and five considerations that likely would have prevented approval of the sale if known by the Court. [Doc. 469-1 at 16-17]. In its response, UMB contends that the allegations of fraud were advanced during the pendency of the case and rejected by the Court. In reply, Movants argue that the prior assertions of fraud identified by UMB were based on "(1) the involvement of Lanny Young behind the scenes …; and (2) the conflict of interest of Alston & Bird" and that the Chapman Report and its exhibits "present a far broader set of circumstances than were known in 2015." [Doc. 493 at 6]. Movants leave it to the Court to unpack the Chapman Report and comb through the record from more than eight years ago to exclude allegations of fraud that have already been raised and rejected or that could have been raised at the time the Court approved the sale but were not.

**Allegations related to the value of the assets**: The Chapman Report states that among the reasons the Court approved the sale was because critical portions of the appraisal were deliberately kept from the Court. [Doc. 469-1 Parts V.A.1 & V.B.1]. The Chapman Report alleges that at the beginning of the project to develop the landfill, GMM obtained an appraisal showing a value of $100 million, that the lenders made their loans based on that appraisal, and that UMB's attorneys Colleen Murphy and Kevin Walsh were aware of the appraisal but did not use it. Therefore, the attorneys intentionally misrepresented the true value of the estate to the Court. [Doc.

469-1 at 8]. A copy of the appraisal is located at Exhibit 5 to the Chapman Report. The appraisal is titled "Green Mountain Management, LLC, Landfill Developmental Overview, Financial Report and Forecast," was prepared by Sterner Consulting, and states that the "effective date for this original report was November 25, 2008 and has been updated as of October 26, 2009." [Doc. 469-1 at 73, 77]. The updated version was prepared for The Piedmont Bank, but the original report was prepared for GMM, and the principals of GMM provided information for the update. [Id. at 73, 77-78, 82].

At an evidentiary hearing on June 4, 2015, on Cowart's motion to appoint a trustee (with the continued hearing on June 10, 2015, the "Trustee Hearing"), counsel for Cowart stated that in the First Interim Cash Collateral Order all parties agreed there was equity in the property, and since that time Cowart had obtained an appraisal and believed the value of the landfill to be $41,997,000. [Doc. 276 at 10]. CFO of the Dan Cowart Companies, Marty Rice, testified that he believed there was value in the equity interest in the landfill based on the Cowart family's investment of $25.5 million, the cash collateral order in which the parties agreed there was equity in the property, and a recently commissioned appraisal valuing the landfill at $23 million and the available airspace at $42 million. [Id. at 38, 40].

At the July 16, 2015, hearing on bidding procedures (with the continued hearing on July 20, 2015, the "Bid Procedures Hearing"), Mr. Katz testified that he received two or three cash bids for the landfill, but they were "way less" than the amount owed to the bondholders and were so low that they were not in the best interest of Debtors. [Doc. 358 at 65-66]. At least two additional potential bids from MidSouth Disposal, LLC and Alawaste, LLC were discussed at the Bid Procedures Hearing. [Id. at 59-61, 66, 82-86, 90-92]. Additionally, Mr. Katz testified that he

contacted approximately 40 candidates for refinancing but received only one offer of $2 million for the equipment, which he did not accept. [Id. at 56].

Cowart filed an objection to approval of the sale to Big Sky in which he argued that the bidding procedures could not "be relied upon to establish the value of Debtors' assets" because they "consisted of at least sixteen (16) amorphous criteria that each bidder must satisfy" in addition to "other criteria unilaterally imposed by UMB" such that "no one knew how to be qualified by UMB and, in turn, no one submitted a bid." [Doc. 361 at 18, 26]. Cowart argued that "the bidding procedures were so flawed, the bidding procedures did not establish that the purchase price to Big Sky is equal to the true value of Debtors' assets being purchased." [Id. at 18]. At the August 12, 2015, hearing on the motion to approve the sale (the "Sale Hearing"), Cowart testified that he did not submit a bid because there were a lot of moving parts that he did not understand and a lot of hurdles, and it looked like he would not be qualified for subjective rather than objective criteria, and he did not believe it was a fair process. [8/12/15 Audio Tr. at 5:03:01 PM].

At the Sale Hearing, Mr. Katz testified about what Debtors had done to implement the bidding procedures, which included discussions at a meeting with the potential bidders as well as two or three new players, but the only bidder who was qualified and acceptable as of the bid date was Big Sky. [8/12/15 Audio Tr. at 2:15:35 PM]. Mr. Katz further testified that Debtors received no higher and better offers than Big Sky's offer. [Id. at 2:20:35 PM]. Additionally, Debtors' largest customer, U.S. Steel slowed down its blast furnace, resulting in a loss of 50-60% of volume since the beginning of the bankruptcy case. [Id. at 2:24:46 PM]. Mr. Katz also testified that he had received proposals from either Mr. Cowart or Mr. Rice, which he rejected. [Id. at 2:51:44 PM]. Mr. Cowart was represented by counsel who examined witnesses at both the Bid Procedures Hearing and the Sale Hearing.

Mr. Cowart testified at the Sale Hearing that he believed there was value in his equity interest in Debtors based on his real estate experience and the appraisal mentioned at the Trustee Hearing.[5] [8/12/23 Audio Tr. at 4:45:21 PM]. He further testified that Mr. Katz's management had resulted in deterioration in value, but he believed the inherent value had not changed. [Id. at 4:46:10 PM]. He further testified that he believed the value of the assets on the petition date was $35 million to $50 million based in part on the fact that it is the largest permitted airspace in the Southeast, it has good access to transportation by road, rail, and water, and it has a 48-state permit, which allows the lower 48 states to send waste to the landfill. [Id. at 4:46:24 PM; 4:51:50 PM].

In the oral ruling on the sale motion, the Court noted that in approving the bidding procedures, the Court entered an order that provided any bidder not considered a qualified bidder or whose bid was not considered a qualified bid could file an objection which would be considered at a hearing and that no such objections were filed, including by Cowart. [8/17/15 Audio Tr. at 1:52:57 PM; see also Doc. 328 at 3]. Therefore, the Court could not agree the requirements were so amorphous that they precluded bidding. [8/17/15 Audio Tr. at 1:53:52 PM]. The Court went on to state that no one sought to admit into evidence an appraisal or testimony of an appraiser. [Id. at 1:56:40 PM]. As a result, the best evidence of value came from the marketing process, including unsuccessful efforts by Mr. Katz to refinance and then to solicit bids, which resulted in only one qualified bid, that of Big Sky. [Id. at 1:54:52 PM]. Mr. Cowart's testimony that there was equity on the petition date was consistent with the cash collateral order, which stated there was equity over and above the debt. [Id. at 1:57:24 PM]. However, the cash collateral order did not quantify the equity and the evidence indicated a decline in Debtors' business. [Id. at 1:57:50 PM].

---

[5] The Court indicated that this appraisal was not given any weight because it was hearsay. [8/12/15 Audio Tr. at 4:45:52 PM; 8/17/15 Audio Tr. at 1:56:48 PM].

Considering all this, the Court concluded that the purchase price represented the best evidence of the value of the assets to be sold. [Id. at 1:58:10 PM].

The Chapman Report does not explain why an appraisal that was more than five years old at the time of the Sale Hearing and made before the landfill was developed would be relevant to the value of the landfill after it had entered bankruptcy and lost the U.S. Steel business. Nor does the Report explain why Cowart was unable to submit as evidence an appraisal that had been "obtained" by GMM long before the bankruptcy case was filed. [Doc. 469-1 at 8]. Furthermore, in ruling on Cowart's motion to appoint a trustee, the Court noted that Cowart argued that "Mr. Katz running the sales process is not maximizing value[.]" [Doc. 292 at 26-27]. The Court rejected this argument because Cowart's investment banker, Dominic Mazzone, testified that an "auction is a potential way to maximize value." [Id. at 27]. Addressing arguments that equity in the case was "in the money," the Court found that evidence as to the value of the landfill was "very limited," consisting of Mr. Rice's testimony that referenced an appraisal not in the record, and the language in the cash collateral order, which was based on value on the petition date, and that there was no evidence of current value. [Id. at 28-29]. The Court concluded that "there's really no basis to find at this point that equity would be paid from a sale. Whether Mr. Katz was conducting it or Mr. Cowart's investment banker was conducting it." [Id. at 29]. The appraisal cited by the Chapman Report, which was even more outdated than the evidence before the Court, would not have changed that conclusion.

**Allegations related to the transfer of Rock Rights**. The Chapman Report states that among the reasons the Court approved the sale was that despite Nuveen/UMB having actual knowledge that legal documents required GMM to operate as a sole purpose entity and that Cowart formed GMA to exploit the Rock Rights in accordance with the law, Nuveen/UMB persuaded the

Court to remove Cowart from operations and appoint Katz and GlassRatner as manager of GMM using false allegations that Cowart had fraudulently transferred Rock Rights and breached his fiduciary duty. [Doc. 469-1 Parts V.A.2-4; Part V.B.2].

UMB's motion to appoint a trustee set forth its allegations that Cowart transferred the Rock Rights for no consideration, for his own benefit, and refused to return them to GMM. [Doc. 108 at 2-3]. That motion was resolved by consent. [Doc. 124]. Cowart's motion to appoint a trustee disputed the allegations made by UMB. [Doc. 245 at 10-11]. At the Trustee Hearing, Mr. Rice testified about his understanding of UMB's concerns about Cowart's actions regarding the Rock Rights. [Doc. 276 at 70-74].

In the oral ruling on Cowart's motion to appoint a trustee, the Court noted that the issue of the Rock Rights was first brought to its attention at the third cash collateral hearing on October 15, 2014. [Doc. 292 at 7-8]. The Court further noted that at a hearing held on November 17, 2014, then-counsel for Debtors advised the Court that Debtors disputed any allegations of wrongdoing asserted in UMB's motion to appoint a trustee but that a negotiated resolution of that motion would be forthcoming. [Id. at 8]. The Court further stated that the term sheet that emerged from the resolution of the UMB motion provided "for GMM to obtain the economic benefits of whatever rights GMA has in the [R]ock [R]ights." [Id. at 10].

Additionally, prior to this Court's order authorizing the sale of assets, GMA filed a lawsuit against Debtors in Gwinnett County, Georgia Superior Court for a declaratory judgment regarding the Rock Rights on June 29, 2015. That lawsuit was removed to this Court on July 9, 2015. [AP 15-5285]. The underlying facts and legal contentions are set forth in the Court's order denying remand and will not be repeated here. [AP 15-5285, Doc. 28]. The removal of the lawsuit as well as Debtors' related motion for sanctions were acknowledged by the Court at the Bid

Procedures Hearing and at the Sale Hearing. [Doc. 358 at 5-6; 8/12/14 Audio Tr. at 5:13:38 PM]. The adversary proceeding was dismissed by stipulation of the parties on May 27, 2016.[6] [AP 15-5285, Doc. 54].

On July 10, 2015, Cowart filed an objection to entry of an order on bidding procedures, alleging in part that he was prohibited from being a qualified bidder unless he transferred the Rock Rights from GMA to GMM. [Doc. 308 at 12]. Cowart objected to such a condition because, among other things, "the [R]ock [R]ights were never part of UMB's collateral" and "GMM has a sublicense from GMA granting GMM all of GMA's rights under GMA's rock permit with Walter Minerals for the life of GMA's permit." [Id. at 13]. Also at the Bid Procedures Hearing, Cowart's counsel argued that "there's no basis for the [R]ock [R]ights issues." [Doc 358 at 19].

Suffice it to say, the allegations and arguments raised in the Chapman Report regarding the Rock Rights, including that UMB's motion to appoint a trustee falsely accused Cowart of fraudulently transferring the Rock Rights from GMM to GMA, were well known to the Court prior to approving the sale of assets. [AP 15-5285 Doc. 1-1 ¶ 41-50]. As a result, the Chapman Report does not allege a colorable claim for fraud on the Court on this basis.

**Allegations related to the use of DIP financing**. The Chapman Report states that among the reasons the Court approved the sale was that Debtors' motion seeking approval of DIP financing stated that the financing was needed to, among other things, build a third cell at the landfill and fund capital expenditures, when counsel for Nuveen knew or should have known that the funds would be used to pay professionals instead. [Doc. 469-1 Part V.A.5].

---

[6] The Chapman Report states that this lawsuit is still pending. [Doc. 469-1 at 7, 11 and Ex. 11].

Testimony about the use of the DIP funds with regard to the building of cell 3 and payment of professional fees was provided by Mr. Rice, William Higginbotham, the CEO of ET Environmental Corporation, Mr. Katz, and Allen Hollander, managing director of GlassRatner, at the Trustee Hearing.[7] [Doc. 276 at 51-53, 57, 64-66, 92-93, 122-28, 177, 179, 192-94]. Mr. Katz testified that when he started on the case, he was told the landfill was running out of capacity and that money from the DIP financing would be needed to fund cell 3. However, the density of waste from customer U.S. Steel was causing the other cells to settle more than anticipated. As a result, Mr. Katz hired an engineering firm to conduct an analysis, which concluded that the landfill had an extra 14 months of life. Nevertheless, work moved forward on cell 3 except for the liner and drains. [Id. at 193]. This testimony was corroborated by the testimony of Mr. Higginbotham. [Id. at 92-93, 103-04, 110-11]. Additionally, Mr. Cowart testified at the Sale Hearing that because of the compaction from the U.S. Steel waste, the critical need for the third cell had diminished, although he stated that it was still critical. [8/12/15 Audio Tr. 4:50:09 PM]. At the Trustee Hearing, Mr. Rice testified that the purpose of the DIP funds included paying administrative expenses, such as professional fees. [Doc. 276 at 66]. Mr. Katz testified to amounts drawn on the DIP loan and amounts paid to professionals. [Id. at 125-27]. Mr. Hollander testified that professional fees had only varied by $9,274 from the projected amounts in the budget used for the cash collateral order. [Id. at 179].

In ruling on Cowart's motion to appoint a trustee, the Court found that deferring costs associated with cell 3, when cell 3 was not needed immediately, resulted in savings to Debtors and increased flexibility by not fully drawing on the DIP loan. [Doc. 292 at 24-25]. The Court further noted that while administrative expenses were substantial, they were not the only thing

---

[7] Cowart also raised this issue in his objection to approval of the sale. [Doc. 361 at 19-20].

money was being spent on; it was also spent to acquire a truck and containers and for maintenance, all of which were authorized under the order approving the DIP loan. [Id. at 25; Doc. 154]. Again, this is not a new issue, and it was considered by the Court, such that it does not demonstrate fraud on the court.

**Allegations related to the involvement of Lanny Young**. The Chapman Report states that among the reasons the Court approved the sale was because UMB attorney Kevin Walsh elicited false testimony from Gabriel Kim, the president of Exoro Global, LLC,[8] which they both knew to be false, and made assurances to the Court about Lanny Young which he knew or should have known to be false. Additionally, UMB attorney Colleen Murphy presented a Letter Agreement between Nuveen/UMB and Big Sky to the Court. The Letter Agreement states that Big Sky and Mr. Kim had severed relations with Young and that further involvement by Young would be an incurable breach of the bond documents. Movants allege that Lanny and his son, Ross Young, were to be excluded from Big Sky but were integrally involved with Big Sky and that the Letter Agreement contained statements that Ms. Murphy, Mr. Walsh, Nuveen/UMB, Mr. Kim, and Big Sky knew to be false. [Doc. 469-1 Parts V.A.6-10; Parts V.B.3-5].

At the Bid Procedures Hearing, William Hendricks, Jr., the general manager of GMM, testified that on approximately July 8, 2015, Mr. Katz advised him that Big Sky had terminated Lanny Young's contract and Ross Young's contract. [Doc. 369 at 81-82]. Mr. Hendricks testified that the next day, July 9, 2015, he observed Lanny Young in a vehicle near the landfill, and it appeared that Mr. Young was giving Big Sky's appraisers directions to the landfill.[9] [Id. at 82-83]. In conjunction with that testimony, the Court admitted into evidence the letter dated

---

[8] Exoro Global, LLC is the 100% owner of Exoro Global Capital, LLC, which is the 100% owner of Big Sky. [Doc. 315 at 1].
[9] Cowart raised this testimony again in his objection to approval of the sale. [Doc. 361 at 15].

16

July 7, 2015, terminating Lanny Young's contract, as well as the March 10, 2015, independent contractor agreement between Exoro Global, LLC and Lanny Young, and the July 16, 2015, Letter Agreement between UMB and Big Sky providing that if Big Sky acquired the landfill, it would not "in any way associate" Lanny Young with landfill operations. [Doc. 369 at 84-85; Doc. 320 Ex. 1-3]. On July 14, 2015, counsel for Big Sky filed an affidavit made by Mr. Kim, stating that Mr. Kim had terminated Lanny Young's relationship with Big Sky and that Lanny Young would have "no involvement whatsoever in Exoro, Big Sky, or the operation or management of the landfill." [Doc. 315 at 2].

Based in part on the foregoing evidence, the Court ultimately concluded that Big Sky was a good faith purchaser, including that there was no evidence of fraud or collusion, and entered an order approving the sale of assets to Big Sky. [Doc. 372 at 5-6; 8/17/15 Audio Tr. at 2:07:10 PM, 2:11:01 PM]. Shortly thereafter, Cowart, both pro se and through counsel, filed papers to stay the Sale Order and for reconsideration of the Sale Order alleging that Lanny Young continued to be associated with Big Sky based on Mr. Kim and Mr. Young having visited Tractor & Equipment Company together after entry of the Sale Order. [Docs. 382, 383]. The Court held an evidentiary hearing on this matter on August 31, 2015 (the "Reconsideration Hearing"), at which it stated: "The issue here is was there a perjured testimony? Has the Court been misled? … [W]as there something that happened in the conduct of the hearings on the sale approval that would cause the [11 U.S.C. §] 363(m) finding to be incorrect." [Doc. 468 at 12-13].

At the Reconsideration Hearing, Mr. Kim testified that Big Sky had communications with Lanny Young after July 14, 2015 (the date of Mr. Kim's affidavit regarding the termination of Mr. Young) but that it was limited to follow-up and transition of items Mr. Young had been working on. [Doc. 468 at 43-47]. Mr. Kim testified that he personally had two or

three communications with Mr. Young after July 14, 2015, including a phone call and a lunch in

Alabama on August 21, 2015. [Id. at 48-49, 69]. At the lunch, Mr. Kim asked Mr. Young about

vendors he had contacted when working for Big Sky. [Id. at 58-60]. After lunch, Mr. Young drove

Mr. Kim to the airport; in doing so, they passed an equipment dealer, and stopped in at Mr. Kim's

request. [Id. at 55, 62]. Mr. Kim and Mr. Young spoke briefly with the used equipment manager,

and the two left after Mr. Kim learned that none of the dealer's equipment would be suitable for

use at the landfill. [Id. at 71-73]. Mr. Kim testified that he had no communications with Lanny

Young after August 21, 2015. [Id. at 83]. Counsel for Cowart argued that the evidence showed

Lanny Young was still involved in the landfill, that perjured testimony had been presented to the

Court, and that Big Sky was not a good faith purchaser under § 363(m). [Id. at 111-12].

       The Court considered all this evidence and argument and denied Cowart's motions.

[Docs. 393; 468 at 124-26]. In ruling, the Court noted that Mr. Kim's testimony at the

Reconsideration Hearing was not inconsistent with prior testimony that Lanny Young would have

no ownership interest in Big Sky. [Doc. 468 at 125]. Additionally, testimony that Mr. Young had

provided transition work was consistent with the independent contractor agreement and the

termination letter. [Id.] While Mr. Kim's interactions with Mr. Young after July 14, 2015, may

have been ill-advised, they did not show perjury or any attempt to mislead the Court. [Id.]. Indeed,

the question of perjury was not "even close[.]" [Id. at 126]. Nothing in the Chapman Report

changes that conclusion.

       **Allegations related to the funding of the purchase of assets**. The Chapman

Report states that among the reasons the Court approved the sale was because Mr. Kim and Big

Sky misrepresented the source of funding to purchase the assets of GMM. [Doc. 469-1 Part V.A.9;

Part V.B.5]. The Report implies that Lanny Young was involved with financing the purchase, that

UMB's attorneys knew he was involved, and that the attorneys misrepresented his involvement to the Court. These contentions are based on allegations that: Lanny Young's son Ross and PR Rishi were both members of RL Jackson Engineering & Consulting, LLC [Doc. 469-1 at 7 n.8]; PR Rishi owned a separate company, PRR Group Holdings, Inc. [Id.]; the source of Big Sky's funds "is believed to be PRR Group Holdings, Inc." [Id. at 8-9]; Mr. Walsh's opening statement at the Bid Procedures Hearing indicated that the character of individuals involved with bidders who proposed to assume the bond debt was important to UMB, and conveyed that "we've taken steps to make sure that they are – that [Lanny Young] and some other people whose names have been bantered about as potential participants in this, will not be part of the deal and will not be part of the deal going forward"[10] [Id. at 113-14]; Mr. Kim's testimony at the Bid Procedures Hearing regarding the source of funds needed to close on the sale was that Exoro Global had access to significant capital through investors [Id. at 120]; and the July 16, 2015 Letter Agreement between UMB and Big Sky, required Big Sky to exclude Lanny Young from involvement in the landfill as, without limitation, "owner, investor, consultant, contractor or employee so long as Big Sky is obligated under the Bonds" and that failure to do so would be a breach of the Letter Agreement and a default under the bond documents. [Id. at 124-25]. The Report states: "There is considerable information and documentation to show the connection between Big Sky, PR Rishi, Ross Young (Lanny Young's son), and Mr. Rishi's investment companies" and that "it is clear that UMB/Nuveen knew about PR Rishi, Ross Young, and the source of the capital. Therefore, one can reasonably conclude that Nuveen knew that Mr. Young had a role in the financing … of Big Sky[.]" [Id. at 9, 10].

---

[10] Mr. Walsh went on to say, "[I]f they do become part of the deal going forward, somehow and if Big Sky is the winning bidder and they don't disassociate from them, *it's a default under the bond documents* and there will be trouble in the future." [Doc. 358 at 23 (emphasis added)].

The Report does not allege that PRR Group is owned or operated by Lanny or Ross Young, the Report does not allege any facts to support the belief that PRR Group funded Big Sky's purchase of GMM's assets other than a business relationship between Ross Young and Rishi, and the Report does not identify any "information and documentation" that shows PRR Group funded the purchase with the knowledge of UMB and UMB's counsel. At the Sale Hearing, Mr. Kim testified that Big Sky had funds available to close on the sale, including $250,000 it had provided to GlassRatner in escrow and more than $2.15 million in its bank account.[11] [8/12/15 Audio Tr. 3:57:47 PM]. Mr. Kim further testified that additional funds to close and for operating capital were available from Big Sky's parents, Exoro Global and Exoro Global Capital, and that Tom Harrington, who would be operating the facility for Big Sky, would be joining Exoro Global Capital to contribute capital for this transaction, but no one else had been contemplated at that time. [Id. at 4:10:28 PM]. Counsel for Cowart had an opportunity to cross examine Mr. Kim and asked whether he had had any discussions with anyone other than Harrington about becoming a member of Exoro Global or Exoro Global Capital, including Lanny Young, and Mr. Kim testified that he had not. [Id. at 4:19:55 PM]. Mr. Kim also testified on cross examination that his prior dealings with Ross Young did not involve the RL Jackson company and that he did not have knowledge of that company. [Id. at 4:40:05 PM].

Even if Movant could substantiate the Report's insinuation that funding for the asset purchase was provided by a company owned by Ross Young's business partner and that this demonstrates Lanny Young's involvement in Big Sky, which UMB's attorneys were aware of and

---

[11] At the Bid Procedures Hearing, Mr. Katz testified that as part of the discussions with Big Sky he had received a bank statement showing a $5 million deposit, but he did not recall whose name (whether Exoro Global or Exoro Global Capital) was on the bank account. [Doc. 358 at 104]. Mr. Kim subsequently testified that he provided Mr. Katz with a bank statement from Exoro Global. [Id. at 130]. Mr. Kim further testified that while Big Sky had a bank account at that time it only had a nominal amount in it because Big Sky was a newly formed entity. [Id. at 130-31].

concealed, nothing in the Court's rulings precludes such involvement, nor would such facts have changed the Court's orders, and therefore they do not establish a basis to reopen the case.

The Report states that PR Rishi, Ross Young, and Rishi's companies "are sources which the court clearly demanded that Big Sky avoid." [Doc. 469-1 at 9]. However, the Court found that based on all the evidence, including "Big Sky's hiring a consultant on a contract basis with experience in the industry who was not hired to manage the facility and is no longer associated with Big Sky, but who has a past conviction and has served his sentence," did not disqualify Big Sky from being a stalking horse bidder. [Doc. 332 at 16]. It was UMB who required Big Sky to disassociate from Lanny Young, subject to breach of the Letter Agreement and default of the bond documents. Any alleged violation of the Letter Agreement or the bond documents is between UMB and Big Sky and should be presented in the appropriate nonbankruptcy forum.

**Other considerations.** Movants cite *Ehrenberg v. Roussos (In re Roussos)*, 541 B.R. 721 (Bankr. C.D. Calif. 2015), in support of their Motion. In that case, the debtors, two brothers, entered a partnership with Michaelides to purchase real property, but failed to include Michaelides on the deeds and then failed to provide his widow with his pro rata share of the rents. *Id.* at 725. The widow sued and obtained a judgment for damages and quiet title. *Id.* The debtors then conspired to deprive the widow of her interest in the property. *Id.* To effect their plan, they formed two entities, S.M.B. and O.F., they filed Chapter 11 cases, and in the bankruptcies they sought to sell the properties to S.M.B. and O.F. free of the widow's interest while falsely declaring to the bankruptcy court that they had no interest in S.M.B. or O.F. *Id.* at 725-26. As a result, S.M.B. and O.F. received protection under 11 U.S.C. § 363(m) as good faith purchasers. *Id.* at 726. The bankruptcy cases were later converted to Chapter 7, and the debtors received discharges, with the widow's judgment excepted from discharge. *Id.*

About 20 years later, the widow discovered the scheme and reported it to the United States Trustee, who moved to reopen the cases. *Id.* at 727. After the cases were reopened, the Chapter 7 trustee filed an adversary proceeding to, among other things, set aside the sale order based on fraud on the court under Rule 60(d)(3). *Id.* The debtors filed a motion to dismiss, which was denied because the complaint alleged sufficient facts to state a claim for fraud. *Id.* at 729. The court stated that "[p]erjury or nondisclosure of evidence may constitute fraud upon the court if 'that perjury or nondisclosure was so fundamental that it undermined the workings of the adversary process itself.'" *Id.* at 729 (quoting *U.S. v. Estate of Stonehill*, 660 F.3d 415, 445 (9th Cir. 2011)). In *Roussos*, the debtors' declarations caused the bankruptcy court's "impartial review" of the sale motion to be "fatally compromised by its lack of awareness of a crucial fact—that the purported arms-length sale was in reality a sale to entities controlled by insiders." *Id.* at 730. While a sale to insiders is permissible, such sales are subject to heightened scrutiny because insiders have an incentive to obtain the property at the lowest price possible. *Id.* "As a result of the [debtors'] false declarations, the court could not apply the heightened scrutiny necessary to insure that the insider sale yielded optimal value." *Id.*

This case is distinguishable from *Roussos*. First, the motion to reopen in *Roussos* was filed by the United States Trustee, and the claim for fraud upon the court was brought by the Chapter 7 Trustee. In this case, prior to filing the Motion, Movants brought their allegations to the United States Trustee, who took no action. Second, the fraud in *Roussos* was perpetuated by the debtors as a concealed insider transaction for their own benefit, which caused the court to apply the incorrect standard in reviewing the sale motion. In this case, the alleged fraud was supposedly perpetuated by the purchaser of the assets in collusion with the bondholder and manager of the Debtor in Possession. However, in this case, unlike *Roussos*, the assets were exposed to the market,

and Mr. Katz received a number of inquiries from prospective bidders, including Cowart, but received no higher and better offers than Big Sky's. There is no allegation that the alleged fraud caused the Court to apply an incorrect legal standard in any of its rulings. Finally, as stated above, even if all Movants' allegations were true, it would not have altered the Court's rulings.

In conclusion, the allegations of fraud on the Court do not contain sufficient facts to state a claim. Therefore, Movants have not shown any basis to reopen the bankruptcy case, and the Motion will be denied.

## IV. Rule 9011

The Motion to Reopen is supported primarily by the Chapman Report, which was prepared three years prior to the filing of the Motion to Reopen, with a disclaimer that it was not prepared based on an independent investigation but based on documents provided to Mr. Chapman and discussions with Cowart. Nothing in the Motion or the Report indicates that Mr. Chapman prepared the Report for purposes of being filed with the Court or that Mr. Chapman is aware that the Report has been filed with the Court in support of the Motion to Reopen. Nor does the Report indicate that it was prepared after review of the entire record in this case; both the disclaimer and the substance of the Report indicate that it was not. Given the foregoing, the Court reminds Movants' counsel to be mindful of its obligations under Federal Rule of Bankruptcy Procedure 9011(b) when presenting papers to this Court.

For the reasons stated herein, it is

ORDERED that the Motion to Reopen is DENIED as futile.

**END OF ORDER**

**Distribution List**

G. Franklin Lemond, Jr.
Webb, Klase & Lemond, LLC
Suite 480
1900 The Exchange, SE
Atlanta, GA 30339

E. Adam Webb
Webb, Klase & Lemond, LLC
Suite 480
1900 The Exchange, SE
Atlanta, GA 30339

Gary W. Marsh
Troutman Pepper
Suite 3000
600 Peachtree Street, NE
Atlanta, GA 30308

David S. Weidenbaum
362 Richard Russell Building
75 Ted Turner Drive, SW
Atlanta, GA 30303

John D. Elrod
Greenberg Traurig, LLP
Terminus 200 - Suite 2500
3333 Piedmont Road, NE
Atlanta, GA 30305

Colleen A. Murphy
Greenberg Traurig, LLP
One International Place
Boston, MA 02110

Pierce Rigney
Troutman Pepper
600 Peachtree St, NE, Ste 3000
Atlanta, GA 30308

Kevin Walsh
Greenberg Traurig, LLP
Suite 2000
One International Place
Boston, MA 02110

Christopher Marks
Greenberg Traurig, LLP
Suite 2000
One International Place
Boston, MA 02110